Angelo M. DANIELS and James
N. Campbell, Appellants,

v.

UNITED STATES, Appellee.

Nos. 96–CF–998, 96–CF–1036.

District of Columbia Court of Appeals.

Argued Sept. 9, 1998.
Decided Aug. 26, 1999.

Courtney E. Ingraffia, appointed by the court, with whom Jeffrey T. Green, Washington, DC, also appointed by the court, was on the brief, for appellant Daniels.

Shawn F. Moore, Washington, DC, appointed by the court, for appellant Campbell.

Danny C. Onorato, Assistant United States Attorney, with whom Wilma A. Lewis, United States Attorney, and John R. Fisher, Mary–Patrice Brown, Thomas J. Tourish, Jr., and Peter R. Zeidenberg, Assistant United States Attorneys, were on the brief, for appellee.

Before TERRY, SCHWELB, and FARRELL, Associate Judges.

TERRY, Associate Judge:

Appellants Daniels and Campbell were convicted of first-degree murder while armed.[1] Daniels was also convicted of possession of a firearm during a crime of violence[2] and possession of a prohibited weapon.[3] On appeal both appellants claim that the evidence was insufficient to support their murder convictions and that the trial court erred in refusing to force the government to accept a stipulation of the testimony of the medical examiner. Daniels contends, in addition, that the court erred in admitting hearsay testimony into evidence and then denying his motion for a mistrial. We reject all of these arguments and affirm the convictions of both appellants.

## I

On November 25, 1994, shortly after 6:00 p.m., Benjamin Holley walked up to a group of people standing in front of an apartment building at 5035 Central Avenue, S.E. Included in the group were Jermaine Morgan,[4] Robert Davis, and appellant Angelo Daniels. When Davis saw Holley, he told him he "didn't want him coming around here no more." Holley replied, "Whatever," and walked off in the direction of his home on nearby Astor Place. After Holley left, Davis remarked, "I should bust his bitch ass."[5] He then turned and said something to Daniels, and the two of them walked around the corner together.

Shortly thereafter, at the corner of Ayers Place and Central Avenue, Davis flagged down a white Oldsmobile with tinted windows and a black top, driven by appellant James Campbell. Campbell stopped the car, and Davis climbed into the back seat next to George Terry, while Daniels got into the front seat. Davis asked Campbell to drive him around the corner so that he could "do something." He said he "wanted to wet someone" and was "going to wet the Bama." Daniels commented that he was "with" Davis.

At the corner of 51st and B Streets, S.E., Davis told Campbell to pull over so that he and Daniels could get out. Davis was carrying a nine-millimeter handgun, as he later admitted in his testimony. When Daniels ran around the front of the car, Terry saw what appeared to be a "big gun" under his arm.

Daniels and Davis ran through an alley next to an apartment building and came out onto Astor Place, where Benjamin Holley was walking alone. When Holley saw the two armed men emerge from the alley, he started to run. Daniels and Davis chased after him, firing toward him from behind. Holley was hit once and fell to the ground. He rose to his feet in an attempt to continue running, but one of his pursuers shot him in the back, and Holley went down again, this time for good. As he lay face down on the sidewalk, Daniels and Davis both stood over him and continued firing. By the time they were finished, Holley had been shot thirteen times. Holley was taken to Prince George's County General Hospital in Cheverly, Maryland, where he was pronounced dead of multiple gunshot wounds. The medical examiner testified that nine of the thirteen shots were fired into Holley's back, at least four of them while he was lying on the sidewalk.[6]

---

1. D.C.Code § 22–2401 (1996).

2. D.C.Code § 22–3204(b) (1996).

3. D.C.Code § 22–3214(a) (1996).

4. Morgan testified that there were "a lot of people ... standing out front gambling."

5. Morgan said that Davis addressed this comment to no one in particular; he "was just talking in general."

6. The medical examiner explained that four of the exit wounds were "shored," indicating that the bullets were fired while the body was pressed up against a hard structure or object, such as a sidewalk.

Reverend William Logan was inside the nearby St. Lucille AME Zion Church, and Bridgette Bazemore and her daughter, Ann Paul, had just parked their car and were on their way to a meeting in the church. All three testified that they heard a volley of gunshots with two distinctly different sounds, one much louder than the other. Several other persons from the neighborhood also testified that they heard the gunshots. The witnesses said that when they looked in the direction of the shots, they saw two men running down a path next to an apartment building, and that the men got into a late-model white (or "ash gray") car with tinted windows and a black top. A witness who saw them entering the car said that one of the men was carrying a "large" weapon.

George Terry was still sitting in the back seat of Campbell's car when he heard the gunfire. He asked Campbell to drop him off somewhere, but Campbell told him to "just chill" and ordered him to get into the front seat. Davis and Daniels soon came running back from the alley and climbed into the back seat. Terry again asked to be let out of the car, but Campbell "just started laughing and pulled off." A few minutes later, however, Campbell dropped Terry off at a corner near his house.

Shortly thereafter, while Reverend Logan held Holley's head in his lap and prayed, Ms. Bazemore and others saw Campbell's car slowly cruising past the scene of the shooting. At about the same time, Officer Darren McCallan of the Metropolitan Police was patrolling in the area when Campbell's car almost struck his police cruiser. The officer gave Campbell an oral warning, but let him drive away. Moments later Officer McCallan received a radio run informing him that there had been a shooting on Astor Place. The broadcast included a lookout for a car involved in the shooting, which McCallan realized was the car he had just allowed to leave.

Jermaine Morgan testified that approximately fifteen minutes after Daniels and Davis left the group at 5035 Central Avenue, Davis returned to the group and "just said, 'I bust his bitch ass.'"

About a month after the shooting, Davis gave Morgan a nine-millimeter handgun, which the police found in Morgan's possession when he was arrested on an unrelated charge in December 1996, more than two years later. The other weapon, an AK–47 automatic rifle, was recovered on January 5, 1995, when police officers executed a search warrant in an apartment on Ninth Street, S.E. Both Daniels and Campbell were in the apartment at the time of the search and were arrested. The rifle was found hidden inside a skylight in the bathroom. Officer Timothy Curtis, a firearms expert, testified that some of the shell casings recovered at the crime scene had been fired from the nine-millimeter pistol and that others had been fired from the AK–47.

Davis testified reluctantly at appellants' trial after receiving limited immunity for his testimony.[7] He admitted his role in the shooting but claimed that Morgan, rather than Daniels, was the other shooter. The government impeached that portion of Davis' testimony with the transcript of a videotaped statement Davis had made to the police following his arrest, in which he said that Daniels had carried the other weapon and had fired several rounds into Holley. The prosecutor also elicited an admission by Davis that he was angry at Morgan for testifying against him when he was separately tried for, and convicted of, Holley's murder.

---

7. Davis had been tried before a different judge and had been convicted of armed second-degree murder and related weapons offenses. Because his case was pending on appeal at the time of appellants' trial, he still had a Fifth Amendment privilege, but he was granted use immunity and was compelled to testify as a government witness. His conviction was recently affirmed by this court in *Davis v. United States,* 724 A.2d 1163 (D.C. 1998).

Neither appellant presented any evidence.

## II

■■■ Both appellants contend that the evidence was insufficient to support their convictions of first-degree murder. In considering these claims, we view the evidence "in the light most favorable to the government, giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact ...." *Curry v. United States*, 520 A.2d 255, 263 (D.C.1987); *accord, e.g., Nelson v. United States*, 601 A.2d 582, 593 (D.C.1991) (citing cases). "The evidence may be deemed sufficient 'even if it does not exclude every reasonable hypothesis other than guilt.' " *Russell v. United States*, 701 A.2d 1093, 1098 (D.C.1997) (quoting *Irick v. United States*, 565 A.2d 26, 30 (D.C.1989)); *see Owens v. United States*, 688 A.2d 399, 406–408 (D.C.1996) (Schwelb, J., concurring). "It is only where there is no evidence upon which a reasonable mind might fairly conclude guilt beyond a reasonable doubt that the trial court may properly take the case from the jury." *Williams v. United States*, 357 A.2d 865, 867 (D.C.1976) (citing cases); *accord, e.g., Frendak v. United States*, 408 A.2d 364, 371 (D.C.1979). In a first-degree murder case such as the one before us, we must determine whether the facts support an inference "that the defendant[s] intentionally killed another human being with premeditation and deliberation." *Patton v. United States*, 633 A.2d 800, 820 (D.C.1993); *see* D.C.Code § 22–2401 (1996).

### A. *Daniels*

■■■ Daniels argues that the government failed to present sufficient evidence to establish his identity as one of the

shooters. He also contends that even assuming he did shoot Holley, the government did not prove that he acted with premeditation and deliberation. To establish premeditation, the government must show that Daniels gave "thought before acting to the idea of taking a human life and [reached] a definite decision to kill." *Watson v. United States*, 501 A.2d 791, 793 (D.C.1985) (citation omitted); *accord, e.g., Ruffin v. United States*, 642 A.2d 1288, 1291 (D.C.1994). Deliberation requires evidence that "the defendant acted with consideration and reflection upon the preconceived decision to kill." *Patton, supra*, 633 A.2d at 820. Both elements "may be inferred from the facts and circumstances surrounding the killing." *Thacker v. United States*, 599 A.2d 52, 57 (D.C.1991); *accord, McAdoo v. United States*, 515 A.2d 412, 427 (D.C.1986) (citing cases).

■■■ We are satisfied that the evidence offered by the government was more than adequate to support Daniels' murder conviction. Several witnesses testified that two men, using different weapons, participated in the shooting. Davis admitted that he was one of the two men involved. Jermaine Morgan saw Daniels leave with Davis immediately after Davis said that he "should bust" Holley. George Terry heard Daniels say that he was "with" Davis in intending to "wet the Bama." [8] Daniels then got out of the car, carrying what appeared to be a "big gun," [9] and set off with Davis to intercept Holley. Another witness, looking out her window moments after the shooting, saw two men getting into a white car, one of whom was carrying a "large" weapon. "The fact that the accused carried the murder weapon, or indeed any deadly weapon, to the murder scene is highly probative of premeditation and deliberation." *Thacker, supra*, 599 A.2d at 57;

---

8. From the context the jury could reasonably infer that "the Bama" was Holley.

9. The shell casings recovered at the scene established that the second gun was an AK–47 semi-automatic rifle. Expert testimony showed that the AK–47 recovered from an apartment where Daniels and Campbell were found and arrested was one of the two murder weapons.

*accord, Harris v. United States,* 668 A.2d 839, 842 (D.C.1995); *McAdoo, supra,* 515 A.2d at 427. When Daniels and Davis found Holley, they shot him thirteen times. At least four of those shots were fired when Holley was lying helpless on the sidewalk. We have held in the past that evidence of multiple gunshot wounds "support[s] an inference that [the defendant] gave the killing a 'second thought' before inflicting the final wound." *Thacker, supra,* 599 A.2d at 57 (citations omitted); *accord, Patton, supra,* 633 A.2d at 820. Holley had no weapon, and there was no evidence to suggest that he had acted aggressively towards either Davis or Daniels. While Davis testified at trial that Morgan, rather than Daniels, carried the AK–47 and helped to kill Holley, the government impeached that portion of Davis' testimony. Moreover, it was well within the jury's prerogative to credit one portion of Davis' testimony while simultaneously discrediting another. The jury could reasonably find, from Terry's and Morgan's testimony and from the surrounding circumstances, that Daniels—not Morgan— was the second gunman.

We hold that the evidence before the jury, viewed in the light most favorable to the government, was sufficient to establish that Daniels intentionally killed Benjamin Holley, and that he did so with premeditation and deliberation. The fact that there was no direct substantive evidence identifying Daniels by name in the act of shooting Holley is inconsequential,[10] for the law recognizes no distinction between direct and circumstantial evidence. *E.g., Ruffin,* 642 A.2d at 1291; *Curry,* 520 A.2d at 263.

### B. *Campbell*

 One who aids and abets another person in committing an offense shares the liability of the principal for all acts committed "in furtherance of the common purpose, if the act done either is within the scope of that purpose, or is the natural or probable consequence of the act intended." *West v. United States,* 499 A.2d 860, 865 (D.C.1985); *see* D.C.Code § 22–105 (1996) (aiders and abettors "shall be charged as principals"). The aider and abettor, however, need not have the same criminal intent as the principal. *See (Charles) Johnson v. United States,* 671 A.2d 428, 435–436 (D.C.1995); *Ingram v. United States,* 592 A.2d 992, 1001 (D.C.), *cert. denied,* 502 U.S. 1017, 112 S.Ct. 667, 116 L.Ed.2d 757 (1991); *Hackney v. United States,* 389 A.2d 1336, 1342 (D.C.1978), *cert. denied,* 439 U.S. 1132, 99 S.Ct. 1054, 59 L.Ed.2d 95 (1979).

 Campbell contends that there was insufficient evidence to support his conviction as an aider and abettor. His conviction must be affirmed, however, if there was sufficient evidence from which a reasonable juror could infer that he "intentionally engaged in conduct from which death was likely to occur as a probable consequence." *Matthews v. United States,* 629 A.2d 1185, 1197 (D.C.1993). "[P]roof of presence at the scene of a crime plus conduct which designedly encourages *or facilitates* a crime will support an inference of guilty participation in the crime as an aider and abettor." *Jefferson v. United States,* 463 A.2d 681, 683 (D.C.1983) (emphasis added). We hold that Campbell's involvement in the crime, even though his role was limited to that of a getaway driver who never even got out of the car, was sufficient under controlling case law to support the jury's verdict.

According to the government's evidence, Daniels and Davis got into Campbell's car, openly agreed to "wet the Bama," and instructed Campbell to "take [them] around the corner so [they could] do something." Daniels, sitting in the front seat next to Campbell, was carrying a large firearm, which was visible beneath his arm when he ran around the front of the car. Campbell kept the car parked in the same location while they were gone. When gun-

---

10. Davis' prior statement implicating Daniels was admitted for impeachment only, with an instruction that it was not to be considered as evidence of Daniels' guilt.

shots were heard, Campbell told Terry to "just chill" and ordered him into the front seat. He then waited for Davis and Daniels to return. When they climbed back into his car, Campbell started laughing and drove off.

From this evidence, a reasonable juror could infer that death was a natural and probable consequence of Campbell's driving two armed men to a particular place so that they could "wet" someone, waiting for their return after hearing gunshots, ensuring that the back seat was clear to facilitate their getaway, and then driving them away from the murder scene to complete their escape. *See Byrd v. United States,* 364 A.2d 1215, 1219 (D.C.1976) (affirming conviction of aider and abettor who drove the principal to the scene of the crime, waited in the car while he committed the crime, and then drove the principal away from the scene); *Bailey v. United States,* 128 U.S.App. D.C. 354, 359, 389 F.2d 305, 310 (1967) (same); *Long v. United States,* 124 U.S.App. D.C. 14, 20–21, 360 F.2d 829, 835–836 (1966) (same). We see no material difference between the present case and any of these three cases, and thus we find no merit in Campbell's sufficiency argument.

### III

Daniels also contends that the trial court committed reversible error in admitting hearsay testimony and then abused its discretion in refusing to grant a mistrial. Counsel for both appellants made timely objections to Morgan's testimony about Davis' out-of-court statements that he "should bust [Holley's] bitch ass," and later that he had just "bust his bitch ass." The trial court initially overruled their objections and allowed the testimony to be heard. Later, however, the court reconsidered its ruling and declared that the second statement should have been excluded as hearsay.

Counsel for Daniels moved for a mistrial, arguing that "there's no way to eliminate from the mind of the jury the fact that [Daniels] was seen leaving the scene with somebody who came back and says in effect I killed him." The trial court ruled that any prejudice to Daniels could be cured with a strong instruction to the jury to disregard the testimony, and therefore denied the motion. At the insistence of Daniels' counsel, however, no curative instruction was given.

 Daniels challenges only the admission of Davis' second statement, which he made when he returned alone to 5035 Central Avenue. The sole purpose served by this statement was to establish the truth of the matter asserted, namely, that Davis had just "bust[ed]" Holley. We therefore agree that the statement was hearsay and should have been excluded. *See Campbell v. United States,* 391 A.2d 283, 287 (D.C.1978).[11] Because Davis later testified at trial and admitted his role in killing Holley, however, we hold that Daniels suffered no prejudice from this error.

 An error of this sort "will be considered grounds for reversal where the appellate court 'cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error.'" *White v. United States,* 613 A.2d 869, 874 (D.C.1992) (en banc) (quoting *Kotteakos v. United States,* 328 U.S. 750, 765, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)). In making this determination, we consider "the closeness of the case, the centrality of the issue affected by the error, and the steps taken to mitigate the effects of the error." *Gaither v. United States,* 134 U.S.App. D.C. 154, 172, 413 F.2d 1061, 1079 (1969) (footnotes omitted); *accord, e.g., Outlaw v. United States,* 604 A.2d 873, 880 (D.C. 1992).

11. The statement was not admissible as a declaration against penal interest because the declarant, Davis, was available as a witness and in fact did testify. *See Laumer v. United States,* 409 A.2d 190, 199–200 (D.C.1979) (en banc).

Davis testified in great detail about his role in the shooting. He stated that he and a companion got out of Campbell's car, ran through "a little cut" toward Astor Place, and repeatedly shot and killed Benjamin Holley. Given this testimony, we do not see how Daniels can plausibly argue that Morgan's testimony about another, more ambiguous admission by Davis could have possibly had any effect on the jury's verdict so prejudicial as now to require reversal. Moreover, "[t]he fact that [Davis] testified and was available for cross-examination removed much of the prejudice usually caused by hearsay testimony." *Battle v. United States,* 630 A.2d 211, 224 (D.C.1993) (citation omitted).

■■■ For similar reasons, we also find no abuse of discretion in the denial of Daniels' motion for a mistrial. A ruling on such a motion is committed to the sound discretion of the trial court, and we "will not overturn [its] decision unless it appears unreasonable, irrational, or unfair ... or unless the situation is so extreme that failure to reverse would result in a miscarriage of justice." *Lee v. United States,* 562 A.2d 1202, 1204 (D.C.1989) (citations omitted); *accord, e.g., Salmon v. United States,* 719 A.2d 949, 956 (D.C. 1997); *United States v. Clarke,* 306 U.S.App. D.C. 251, 264, 24 F.3d 257, 270 (1994). Giving the trial court's ruling the deference to which it is entitled, *see Peyton v. United States,* 709 A.2d 65, 69 (D.C. 1998), we see no basis for reversal.

■■■ Nor can we find any misconduct by the prosecutor in presenting Morgan's testimony about Davis' statement. On the contrary, it appears that the prosecutor had a good faith, albeit erroneous, belief that the statement was admissible to show state of mind. In addition, this particular bit of testimony was not central to the government's case; indeed, Davis' subsequent admissions on the witness stand rendered it cumulative and relatively insignificant. Considered in light of all of the evidence presented, the recitation of the incriminating statement made by Davis af-

ter he returned to Central Avenue, unaccompanied by Daniels, added little or nothing to the weight of the government's case against Daniels.

■■■ We also find it significant that the trial court offered to give a curative instruction which might have mitigated any potential prejudice to Daniels, but that Daniels' counsel rejected the offer. We have repeatedly said that trial courts should seek to avoid a mistrial whenever possible by taking "appropriate corrective action which will minimize potential prejudice." *Goins v. United States,* 617 A.2d 956, 958 (D.C.1992). "Thus a trial court does not abuse its discretion when prejudice can be cured by an instruction to the jury, and a corrective instruction is offered but declined." *Smith v. United States,* 665 A.2d 962, 967 (D.C.1995) (citing *Goins* ). We recognize that there are times when, "as a matter of strategy, defense counsel may decide that it is more effective simply to let a potentially prejudicial remark pass, rather than drawing attention to it further by requesting a curative instruction." *Clark v. United States,* 639 A.2d 76, 80 (D.C.1993). However, we have also declared:

> [W]here a defendant asserts that certain testimony is so prejudicial as to require a mistrial, yet refuses any curative instruction, we will still consider whether a curative instruction was available that might have mitigated the alleged harm to the defendant's case.

*Id.* (citations omitted); *see Brown v. United States,* 627 A.2d 499, 508 (D.C.1993).

In this case, the prejudicial impact of Morgan's testimony about Davis' statement was minimal, and any harm that did result could have been cured by the instruction offered by the trial court. Consequently, we hold that the trial court did not abuse its discretion in denying Daniels' motion for a mistrial.

## IV

Appellants' final contention is that the trial court erred in admitting the testimo-

ny of the medical examiner and the accompanying autopsy photographs into evidence, instead of requiring the government to agree to a stipulation.

Before the medical examiner took the stand, counsel for Daniels objected to the admission of photographs of the victim taken during the autopsy on the ground that they were inflammatory and unduly prejudicial. The prosecutor explained that the photographs, in conjunction with the testimony, would show that Holley sustained thirteen gunshot wounds, and that nine of the entrance wounds were in his back. Counsel for Daniels offered to stipulate "to the coroner's testimony," and counsel for Campbell agreed to stipulate to the number of shots and the placement of the entrance and exit wounds. The prosecutor responded that the medical examiner would also testify, with the aid of the photographs, that several of the wounds were "shored," thus showing that the victim was shot while lying face down on the sidewalk. The court suggested that the prosecutor "write out twenty-five lines that captures everything you just said and [defense counsel] will agree to it as undisputed facts in the case." The prosecutor expressed doubt that the defense would agree to such a stipulation, adding that the evidence would also lend support to the government's contention that two different guns had been used to kill the victim, and would demonstrate that the placement of the wounds indicated a defensive posture. He said he would stipulate that Holley was struck at least several times by bullets from the AK–47, but both defense counsel remained silent in the face of this offer. The court then proceeded to weigh the probative value of each photograph against the danger of unfair prejudice, and eventually admitted five of the eight photographs offered by the government.[12]

The United States Supreme Court recently reaffirmed the established general rule that the prosecution in a criminal case may not be forced to accept an admission or stipulation in lieu of live testimony or tangible evidence. In *Old Chief v. United States*, 519 U.S. 172, 117 S.Ct. 644, 136 L.Ed.2d 574 (1997), the Court instructed federal trial courts, when they are engaged in balancing the probative value of a challenged piece of evidence against the danger of unfair prejudice, to take into consideration any alternative evidence that is available to prove the same point as the challenged evidence, and to determine whether the marginal probative value of the challenged evidence outweighs the risk of unfair prejudice. *Id.* at 180–183, 117 S.Ct. 644. When the alternative evidence is an admission or stipulation by the defense, however, trial courts must give full weight to the significant probative distinctions between testimonial or tangible evidence and a stipulation offered as a substitute. *Id.* at 186–189, 117 S.Ct. 644. "[A] criminal defendant may not stipulate or admit his way out of the full evidentiary force of the case as the Government chooses to present it." *Id.* at 186–187, 117 S.Ct. 644.

The defendant in *Old Chief* was charged with possession of a weapon by a convicted felon. One element of the offense was that the defendant had been previously convicted of a felony. The government wanted to introduce a copy of the judgment of his prior conviction, which contained the name and nature of the offense he had committed. The defense objected on the ground of undue prejudice and offered to stipulate to the fact that he had been previously convicted of a felony.

The Supreme Court observed that presenting a case through live testimony and tangible evidence "not only satisfies the formal definition of an offense, but tells a colorful story with descriptive richness." *Id.* at 187, 117 S.Ct. 644. Such proof fulfills the government's need for "eviden-

---

**12.** The only additional objection raised during this time was that there were "too many photographs" and that they were cumulative of each other. Neither defense counsel made any further mention of an offer to stipulate.

tiary depth to tell a continuous story . . . ." *Id.* at 190, 117 S.Ct. 644. Additionally, "[u]nlike an abstract premise, whose force depends on going precisely to a particular step in a course of reasoning, a piece of [tangible] evidence may address any number of separate elements, striking hard just because it shows so much at once . . . ." *Id.* at 187, 117 S.Ct. 644.

> [T]he evidentiary account of what a defendant has thought and done can accomplish what no set of abstract statements ever could, not just to prove a fact but to establish its human significance, and so to implicate the law's moral underpinnings and a juror's obligation to sit in judgment.

*Id.* at 187–188, 117 S.Ct. 644. In addition, the Court said, jurors have certain "expectations about what proper proof should be." *Id.* at 188, 117 S.Ct. 644. If those expectations are not met, "jurors may well wonder what they are being kept from knowing," *id.* at 189, 117 S.Ct. 644, and may draw a negative inference against the party who disappointed them. *Id.* at 188, 117 S.Ct. 644.

The Court then proceeded to craft a very narrow exception to the general rule against forced stipulations. In certain highly limited circumstances, it held, an offer to stipulate may so diminish the probative value of an alternative piece of evidence offered to prove the same fact as to render the latter more prejudicial than probative. *Id.* at 190–191, 117 S.Ct. 644. Turning to the facts of the case before it, the Court held that none of the considerations normally favoring testimony or tangible evidence over stipulations applied when the point at issue was the defendant's status as a convicted felon. Hence the choice of evidence presented to the trial judge was not "between eventful narrative and abstract proposition, but between propositions of slightly varying ab-

straction . . . ." *Id.* at 190, 117 S.Ct. 644. In this situation, the Court held, excluding the nature of the prior crime (rather than the mere fact of the conviction) from the evidence before the jury "would not deprive the prosecution of evidence with multiple utility" because the statute under which the defendant was charged made no distinction among various felonies. *Id.* "The most the jury needs to know is that the conviction admitted by the defendant falls within the class of crimes that Congress thought should bar a convict from possessing a gun . . . ." *Id.* at 190–191, 117 S.Ct. 644. Finally, because the point at issue went "to an element entirely outside the natural sequence of what the defendant is charged with thinking and doing to commit the current offense," its exclusion would not interfere with the prosecution's ability to present its case as a seamless narrative of events. *Id.* at 191, 117 S.Ct. 644.

The Court ruled that there was "no cognizable difference between the evidentiary significance" of the proffered stipulation and the copy of the judgment offered in lieu of that stipulation. *Id.* at 191, 117 S.Ct. 644. Since the only difference between the two pieces of evidence was that one presented an inherent risk of unfair prejudice while the other did not, "the only reasonable conclusion," under FED. R. EVID. 403, was that the government's evidence should be excluded. *Id.*[13]

The Court specifically limited the reach of its holding to cases involving a defendant's status as a convicted felon, *id.* at 183 n. 7, 117 S.Ct. 644, and took pains to reaffirm the general rule that the prosecution cannot be forced to accept "the substitution of an admission for evidence creating a coherent narrative of [the defendant's] thoughts and actions in perpetrating the offense for which he is being tried." *Id.* at 192, 117 S.Ct. 644. Wheth-

---

13. Four Justices dissented from this portion of the opinion, concluding that the majority had "misapplie[d]" Rule 403 and had "upset[ ], without explanation, longstanding pre-

cedent regarding criminal prosecutions." 519 U.S. at 192, 117 S.Ct. 644 (O'Connor, J., dissenting).

er the instant case fits within the general rule or the exception is the question we now must answer.

Although this court has never squarely addressed this issue, dictum in several of our cases strongly supports the general rule. *See, e.g., McClellan v. United States,* 706 A.2d 542, 558 (D.C.1997) ("a party cannot be forced to stipulate to a fact instead of presenting evidence to prove the fact"), *cert. denied,* —— U.S. ——, 118 S.Ct. 2073, 141 L.Ed.2d 149 (1998); *United States v. Montgomery,* 478 A.2d 1088, 1091–1092 (D.C.1984) ("The government's offer to stipulate to the *fact* that the victim picked a photo of someone other than the defendant does not ... fill the void created by the loss of the photograph itself for viewing by the jury" (emphasis in original)); *Bernard's Fur Shop, Inc. v. De Witt,* 102 A.2d 462, 464 (D.C.1954) ("A mere stipulation as to the witness's testimony would hardly have had the same weight before a jury as the testimony of the witness herself"); *see also United States v. Cockerham,* 155 U.S.App. D.C. 97, 100, 476 F.2d 542, 545 (1973).[14]

As these citations reveal, the courts of the District of Columbia have long accepted the general rule as set forth in *Old Chief.* We have found no case to the contrary. Accordingly, we now expressly hold that a trial court may not force a party to accept a stipulation in lieu of presenting live testimony or tangible evidence, except in very limited circumstances. Live testimony or tangible evidence offers so many significant advantages over a stipulation that we think it would be grossly unfair for a court to force a party to rely on the latter rather than the former, for a stipulation will almost never have the same probative value and persuasive power as the testimony of a live witness or a tangible object. As the Court explained in *Old Chief:*

A syllogism is not a story, and a naked proposition in a courtroom may be no match for the robust evidence that would be used to prove it. People who hear a story interrupted by gaps of abstraction may be puzzled at the missing chapters, and jurors asked to rest a momentous decision on the story's truth can feel put upon at being asked to take responsibility knowing that more could be said than they have heard.

519 U.S. at 189, 117 S.Ct. 644. Only when there is "no cognizable difference," *id.* at 191, 117 S.Ct. 644, in evidentiary significance between an offered stipulation and a challenged piece of evidence, and the challenged evidence presents a real danger of unfair prejudice, may a trial court force a party to accept the stipulation.

A recent decision by the United States Court of Appeals for the District of Columbia Circuit illustrates the extremely limited applicability of the exception carved out in *Old Chief.* In *United States v. Crowder,* 329 U.S.App. D.C. 418, 141 F.3d 1202 (1998) (en banc), two defendants, Crowder and Davis, challenged their separate convictions for possession of narcotics with intent to distribute. In Crowder's case, the government wanted to introduce testimony that the defendant had sold drugs several months after his arrest in order to show knowledge, intent, and *modus operandi.* Crowder, however, offered to stipulate that "anybody" who possessed the amount of drugs recovered in his case would have an intent to distribute. His defense was that he was never in possession of the drugs which were seized and

---

14. The court in *Cockerham,* in language directly applicable to the instant case, upheld a trial judge's refusal to require the government to agree to certain stipulations:

Appellant attempted to stipulate all facts of the crime proof of which would have tended to have inflammatory impact, and argues now that he had a right to so stipulate. We agree with other courts that have considered the matter and held that there is no such right, and find that the trial judge acted properly in refusing to require the Government, which had agreed to several stipulations, to agree to others offered.

155 U.S.App. D.C. at 100, 476 F.2d at 545 (citations omitted).

that the police planted the evidence on him. In the other case, Davis was arrested after selling crack cocaine to an undercover agent, and a large quantity of cocaine and some marked bills were found in a car in which he was riding at the time of his arrest. The government sought to introduce evidence of three prior drug sales in order to prove knowledge and intent to distribute. Davis offered to stipulate that "the person" who sold the drugs to the undercover agent possessed the necessary intent and knew about the cocaine in the car; his defense was simply that the police had arrested the wrong man.

Finding several "cognizable differences" between the evidentiary significance of the government's evidence and the stipulations offered by the defendants, the Court of Appeals held that the trial court did not err in refusing to force the government to stipulate in either case. The court first observed that the challenged items of evidence in the two trials were relevant to intent and knowledge, elements at the very "core of the offenses charged," *id.* at 423, 141 F.3d at 1207, so that forcing the government to accept a stipulation in these cases would seriously interfere with its ability to present the jury with a seamless narrative of events. The court also declared that the choice in each of the cases before it was not between two equally abstract documents, but rather between "concrete evidence of the defendants' actions giving rise to natural and sensible inferences, and abstract stipulations about hypothetical persons not on trial." *Id.* at 424, 141 F.3d at 1208.[15] Additionally, the government's evidence in each of the two cases had "multiple utility, showing at once intent, knowledge, motive, preparation and the like." *Id.* The court concluded that the narrow circumstances justifying an *Old Chief*-type exception to the general rule against forced stipulations were not present. *Id.* at 426, 141 F.3d at 1210.

In this case as in *Crowder*, the record reveals significant differences between the evidentiary value of the challenged evidence and that of the proposed stipulation. The medical examiner's testimony, aided by the accompanying photographs, demonstrated that the victim was shot thirteen times, that nine of these shots were in the back, and that at least four of them were fired while the victim was lying face down on the sidewalk. In addition to establishing the cause of death and the identity of the victim, this evidence tended to show that whoever killed Benjamin Holley did so intentionally, with premeditation and deliberation. The photographs also showed that there were several wounds with a significantly larger diameter than the others, supporting the inference that the victim had been shot with bullets of two different calibers, and hence by two different persons. All of these points were central to the government's theory of the case. The testimonial and photographic evidence played an intricate role in describing in detail the government's version of events. To force the government to accept a stipulation in lieu of this evidence would have seriously and unfairly impaired its ability to present its case.

Finally, as the Court recognized in *Old Chief*, there is a reasonable likelihood that the jury in this murder case came to court with an expectation that the government's evidence would include testimony from the medical examiner about the cause and circumstances of the victim's death, and very possibly photographs of the victim as well. If this evidence were replaced with the reading of a stipulation, the jury might well have felt that the government was trying to hide something and, as a result, might have penalized the government by drawing negative inferences against its case. *See Old Chief*, 519 U.S. at 188–189, 117 S.Ct. 644.

In sum, we hold that the limited circumstances warranting an exception to

15. The court characterized the stipulations proposed by Crowder and Davis as "ambiguous, conditional, and tentative." 329 U.S.App. D.C. at 426, 141 F.3d at 1210.

the general rule that a party may not be forced to accept a stipulation in lieu of testimonial or tangible evidence are not present in this case, and that the trial court therefore did not err in refusing to compel the government to accept such a stipulation.

## V

Appellants are thus left with the argument that the trial court abused its discretion in admitting the medical examiner's testimony and the accompanying photographs. Because the trial judge could reasonably conclude that the probative value of this evidence outweighed the risk of unfair prejudice to either appellant, we find no abuse of discretion.

When relevant evidence is challenged on the ground of unfair prejudice, it may be excluded only if "the danger of unfair prejudice *substantially* outweigh[s] [its] probative value …." *(William) Johnson v. United States*, 683 A.2d 1087, 1099 (D.C.1996) (en banc) (emphasis in original) (adopting FED. R. EVID. 403 for the District of Columbia courts as a correct statement of the law), *cert. denied*, 520 U.S. 1148, 117 S.Ct. 1323, 137 L.Ed.2d 484 (1997). As with all evidentiary rulings, we review the trial court's decision only for abuse of discretion. *E.g., Roundtree v. United States*, 581 A.2d 315, 323 (D.C.1990). In matters involving relevance, we have recognized that "the evaluation and weighing of evidence for relevance and potential prejudice is quintessentially a discretionary function of the trial court, and we owe a great degree of deference to its decision." *(William) Johnson, supra*, 683 A.2d at 1095.

We cannot deny that the graphic testimony and photographs challenged in this case presented some risk of prejudice. That fact, however, does not necessarily mean that the evidence should have been excluded. On the contrary, we have consistently upheld the admission of similar evidence on the ground that its probative value outweighed its prejudicial effect. For example, in *Pittman v. United States*, 375 A.2d 16 (D.C.1977), we held that black and white photographs of a murder victim lying face down in a pool of blood were not so unduly gruesome as to create a risk of inflaming the passions of the jury. "The fact that appellant did not dispute where the murder occurred does not render the photographs inadmissible so long as they were in some way relevant, either independently or as corroborative of other evidence." *Id.* at 19 (citation omitted). *See also Gethers v. United States*, 684 A.2d 1266, 1273 (D.C.1996) (physician's testimony about the "grim particulars" of the victim's gunshot wounds "and the medical procedures necessary to treat them"), *cert. denied*, 520 U.S. 1180, 117 S.Ct. 1458, 137 L.Ed.2d 562 (1997); *(Alfred) Johnson v. United States*, 613 A.2d 888, 895 (D.C. 1992) (photographs of a rape victim who was burned with an iron); *Leasure v. United States*, 458 A.2d 726, 728 n. 2 (D.C. 1983) (photograph of murder victim at crime scene admitted to prove his identity); *Faunteroy v. United States*, 413 A.2d 1294, 1299 (D.C.1980) (photographs of emaciated two-year-old child neglected by parents).

The challenged evidence in this case clearly had substantial probative value. The record convinces us that it was not offered solely for the purpose of inflaming the jury, and hence we hold that the trial court did not abuse its discretion in permitting the medical examiner to testify with the aid of the autopsy photographs.

## VI

Appellants' convictions are accordingly

*Affirmed.*