Thurman PARKER, Jr., Appellant,

v.

UNITED STATES, Appellee.

No. 96–CF–340.

District of Columbia Court of Appeals.

Argued May 19, 1998.

Decided Aug. 24, 2000.

Peter H. Meyers, appointed by the court, for appellant.

Margaret A. Flaherty, Assistant United States Attorney, with whom Wilma A. Lewis, United States Attorney, and John R. Fisher and Thomas J. Tourish, Jr., Assistant United States Attorneys, were on the brief, for appellee.

Before TERRY, SCHWELB, and RUIZ, Associate Judges.

TERRY, Associate Judge:

Appellant Parker was convicted of first-degree felony murder while armed, first-degree premeditated murder while armed, attempted robbery while armed, assault with a dangerous weapon, possession of a firearm during the commission of a crime of violence, and carrying a pistol without a license. On appeal he contends (1) that the trial court erred in denying his motion for a mistrial based on allegations of juror and witness intimidation; (2) that the court, in violation of his Sixth Amendment rights, limited his cross- and recross-examination of two witnesses; (3) that the prosecutor made improper and prejudicial remarks during her opening statement and closing argument; and (4) that several of his convictions merge. The government does not contest the merger claim. We affirm the convictions on the merits and remand for resentencing.

I

A. *The Government's Evidence*

On the evening of April 30, 1993, Darrick Wilson and his cousin, Eric Robinson, both in their teens,[1] met at the home of Wilson's grandparents to watch television and drink beer. Later in the evening, they decided to go to a carry-out and get something to eat. Because the carry-out was crowded when they got there, they went instead to visit a friend who lived nearby. The friend was not at home, however, so they headed back to Wilson's grandparents' house, taking a short cut through a courtyard behind an apartment building.

As they crossed the courtyard, they saw two men coming toward them from a darkened stairwell. One of the men yelled, "Who is this? Come here. Hold up." When the cousins began to walk faster, one of the approaching men called out, "Don't move," and then, "Who is this, Darrick?" Hearing his name, Darrick Wilson stopped to look at the person who was calling him and saw that it was Thurman Parker, whom he had known for several years[2] and had just seen a few days earlier. Robinson stopped also and stood behind Wilson.

As Parker approached, he was holding a gun in his left hand and pointing it at Wilson's abdomen.[3] Parker said, "Don't move, don't move," and stuck his right hand halfway into Wilson's pocket.[4] At the same time, the second man made an obscene threat. Afraid that he was going to be shot, Wilson immediately turned around to run. As soon as he turned, Wilson heard gunshots and then felt a "thumping . . . burning" pain in his right

---

1. Wilson was nineteen and Robinson, the murder victim, was seventeen.

2. Wilson testified that he had known Parker since they both attended the same junior high school. Wilson also knew Parker's sister and some of his friends. He frequently saw Parker around the neighborhood. They were on speaking terms, but did not socialize.

3. Wilson testified that he was not carrying anything in his hands, nor was Robinson.

4. The gun at this moment was pointing toward the ground.

leg. Without falling, and without looking back, Wilson ran toward his grandparents' house. As he was running, Wilson heard nine or ten more gunshots from what sounded like a single gun.

When Wilson reached his grandparents' home, he told his grandmother that he and Eric Robinson had just been shot.[5] Wilson then left the house and headed for a nearby apartment building where his friend Arvel Williams lived. As he neared the building, however, he collapsed on the front steps and called out to Williams for help. When Williams came outside, Wilson told him that he and Robinson had just been shot by Thurman Parker, whom Williams also knew from the neighborhood. Williams told Wilson not to move and went to call the police and an ambulance.

A few minutes later, an ambulance arrived and took Wilson to Howard University Hospital, where he spoke with Homicide Detective Mary Lanauze. Wilson told the detective that Thurman Parker had shot him.[6] While still at the hospital, Wilson's mother told him that Eric Robinson was dead.[7] The following afternoon, after he was released from the hospital, Wilson went to the police station, where he spoke with Detective Lanauze and two other officers. Again he told the police that Thurman Parker was the gunman. Wilson then selected Parker's picture from a spread of photographs shown to him by the police.

On cross-examination, Wilson acknowledged that before the shooting he and Robinson had each consumed three twelve-ounce cans of beer. Wilson denied telling Donald Gatling that it was too dark in the courtyard to see who shot him, denied accusing "Reds" as the person who shot him, and denied telling Robinson's father, a couple of days after the incident, that he did not know who had shot his son.

At the conclusion of defense counsel's cross-examination, the prosecutor said she would like to ask Wilson about Donald Gatling. In addition, outside the presence of the jury, the prosecutor informed the court that Mr. Gatling had been making collect calls from the jail to Mr. Wilson. The following exchange ensued:

> MR. JONES [defense counsel]: He [Gatling] will be here. You can talk to him.
>
> MS. POLIN [the prosecutor]: I don't want to talk to him. I want to redirect my witness and bring that out.... Just the fact that he's in jail, he's making collect calls, he's saying all sorts of things to him [Wilson]. I'd like to bring that out on redirect.
>
> THE COURT: All right.

Wilson then testified on redirect that Donald Gatling had called him from jail fourteen or fifteen times, beginning about three months before the trial began. Gatling repeatedly told Wilson not to go to court and testify against Parker, but rather to "settle it with [Parker] on the street." The night before Wilson came to testify,

---

**5.** In response to the question, "How did you know that Eric ... had been shot?", Wilson said, "Because he wasn't behind me."

**6.** Officer Dwight McKinnon later testified that when he responded to a call about gunshots in the 300 block of Division Avenue, he found another officer and a medic attending to the wounded Darrick Wilson. Wilson told Officer McKinnon that Thurman Parker had shot him and that Parker lived "somewhere off Division Avenue and 51st Street."

**7.** Police officers found Robinson's body on a path near the apartment building where the shooting occurred. There was no gun or other weapon anywhere near the body. The

medical examiner testified that Robinson had been shot twice, once in the back and once in the right knee, and that the wound in the back was fatal. The police recovered eleven expended shell casings and two bullet fragments from the scene. A firearms expert testified that all of the shell casings were the same size (nine-millimeter). Two of them did not have enough markings on them to enable the expert to form an opinion, but the other nine, he said, had all been fired from the same gun. From other observations—*e.g.,* the absence of powder burns—the expert concluded that the shooter had been chasing Robinson and that Robinson had been at least three feet away from the shooter when he was shot.

Gatling called his house twice, but Wilson would not speak with him. Wilson also said he was nervous about testifying.

After redirect, defense counsel said he had "a couple of questions." The court called both counsel to the bench, where the following discussion took place:

MR. JONES: Your Honor, I have a couple of questions—

THE COURT: Almost the entire redirect was repetitious. What could you possibly go into on recross?

MR. JONES: Well, I can do it with him, or I can do it with Mr. Gatling. These questions about why he was calling him on—you know, long distance or collect from jail.

THE COURT: He doesn't know why he called.

MR. JONES: Well, he made some comments to him about—

THE COURT: As to what was said—

MR. JONES:—about the fact that he should stop lying and tell the truth.

THE COURT: That's irrelevant. It's inadmissible, anyway. I won't permit that.

Detective Mary Lanauze testified that during the early morning hours of May 1 she and another detective responded to a call about a shooting in the 200 block of 51st Street. By the time she arrived, Robinson had already been transported to the hospital. Detective Lanauze then went to Howard University Hospital to meet with the other victim, Wilson. When she spoke with Wilson in the emergency room, he told her that Thurman Parker had shot him and that Parker lived in Lincoln Heights. The following afternoon, Detective Lanauze met with Wilson at the police station and took a written statement from

him. Wilson again identified Thurman Parker as the shooter and selected Parker's picture from an array of photographs.

On cross-examination, Detective Lanauze acknowledged that at no time during her discussions with Wilson at the hospital or the police station did Wilson tell her that Parker had tried to rob him.[8] She also said that Wilson never told her there was a second person in the courtyard at the time of the shooting. Finally, Detective Lanauze testified that execution of a search warrant at Parker's last known address did not yield any evidence related to the murder.

Officer Todd Gray testified that when he placed Parker under arrest, Parker said his name was Godfrey Dwayne Cherry. Parker also gave an address, date of birth, and social security number which turned out to belong to the real Mr. Cherry.

### B. The Defense Evidence

Parker testified that he was not in the courtyard on the night of April 30 and May 1 and that he did not shoot Wilson and Robinson. He said he gave the police a false name and address because "police got a bad habit of stopping you ... you get harassed if they know your name like that." Parker admitted that he knew Wilson from junior high' school but said he had not seen him in the neighborhood since they left school several years earlier. On cross-examination, Parker acknowledged that he was left-handed.[9]

Anthony Tucker, a junior high school classmate of both Parker and Wilson, testified that Wilson was known to be a liar. He also knew Wilson from high school.

8. Defense counsel also asked Detective Lanauze whether Wilson had told her that the person who approached them in the courtyard grabbed Robinson. When the detective said she did not recall, counsel asked to refresh her memory with Wilson's written statement, which she had typed at the police station. The prosecutor objected to the impeachment of Wilson's testimony through this witness. The court, noting that Wilson had never testified that anyone grabbed Robinson, sustained the objection.

9. Wilson had earlier testified that when Parker pointed the gun at him, he was holding it in his left hand.

Tucker said that a short time after May 1 he saw Wilson limping home from school. Wilson told Tucker that he had been shot. When Tucker asked who had shot him, Wilson responded that he did not know but said "it was some guys that [he] had an altercation with prior to, like a week or two ago." Tucker also stated that Wilson told him that "he saw his cousin go down."

Sulaimen Williams, a close friend of Tucker, with whom he had recently been arrested in an unrelated robbery case, testified that he had not known Parker until they shared a jail cell together, but that he knew Wilson from high school. Sometime after May 1, Williams said, he heard Wilson tell a group of people that he and his cousin had been shot, and that after the shooting he ran back to his house to get a gun to retaliate against "whoever" had shot them; he never said, however, that Parker was the shooter. Wilson also told the others that his cousin had a "nine Taurus" and shot back at the people who shot them. Finally, Williams testified that Wilson was known for carrying a .12 gauge shotgun.

## C. *Facts Relating to the Claim of Juror Intimidation*

At the beginning of the second day of trial, the judge informed both counsel that Juror 988 (sitting in seat 5) had called his chambers the previous evening because he was troubled by some comments he had overheard. The judge, who had declined to speak to the juror when he called, had Juror 988 brought to the bench to say whatever he had to say in the presence of both attorneys. The juror stated that another juror had told the courtroom clerk, in a voice loud enough for other jurors to hear, that she had previously served in a murder trial and that after the trial began

> someone connected with the defendant ... showed up at her front door, and she complained to the court about it, and

the court, according to her, had not done anything about it. She seemed pretty agitated to me, and she asked the clerk what were we doing now.

Juror 988 added that "everybody else is talking about" what the other juror had said, and that some jurors were discussing whether they should even eat lunch in the courthouse cafeteria. Juror 988 said that he was not affected by the first juror's comments but was concerned about his fellow jurors' state of mind.

The judge offered to advise the remaining jurors that in all his years on the bench he had never heard of jurors being harassed, and then to ask if the overheard comments of the juror to the clerk "would make it difficult for them to fairly decide the case." The prosecutor noted that "recently we have been experiencing some juror intimidation," but said that she had no objection to the judge's proposal. Defense counsel, however, did object and moved that the entire jury be dismissed because of the "specter of jury intimidation," and that a mistrial be declared and a new jury chosen. Without granting counsel's request,[10] the judge said that "the specter of juror fear in a murder case ... is going to be there whether it's articulated or not." He then advised the jury as proposed and individually questioned each juror.

Twelve jurors responded that apprehensions about their safety would not interfere with their ability to decide the case fairly. Two jurors, however, did express some concern. Juror 275 (in seat 11) stated that she felt "anxious" about her own safety and that of her family and was not sure if her anxiety would affect her decision. Juror 700 (in seat 9), the juror who had initially raised the issue of intimidation with the clerk the day before, said she did not want her address made available to the defense but recognized that her prior experience was "irrelevant" to this case.

---

**10.** On appeal, Parker does not contend that the court erred in refusing to dismiss the jury; in fact, he acknowledges that the court's deci-

sion was probably correct "at that point in time."

The court assured the juror that her address, as well as the addresses of any of the other jurors, would not be released. In response to defense counsel's question, "Anything that happened in that previous case, you wouldn't hold against my client?", Juror 700 said, "No." At the end of the questioning, the judge dismissed Juror 275 and made Juror 700 an alternate.

On the following Monday, Juror 293 (in seat 6) informed the court that the previous Saturday night she had received at her home two collect calls from D.C. Jail and that she was concerned. Appellant Parker said he knew nothing about the incident. When the judge questioned the juror, she said that the calls—which she did not accept—"disturbed" her, but she did not believe they were connected with Parker. The judge instructed her not to discuss the calls with the other jurors but did not dismiss her, finding that "she's given every answer that indicates that she can be fair." The next day, however, after the jury had been instructed, defense counsel moved for a mistrial "based on the problems with the juror we had in seat No. 6." In the alternative, counsel asked that Juror 293 be designated an alternate and that Juror 700 be redesignated a regular deliberating juror. Both requests were denied.

## II

Parker argues that a mistrial should have been granted because "the issue of juror and witness intimidation was repeatedly and improperly injected into the trial." He points to the general concerns of juror intimidation raised at the outset of the trial by Juror 700, testimony elicited from Darrick Wilson on redirect about intimidating phone calls from an inmate at the jail, and collect calls from someone at the jail to Juror 293. A mistrial, however, "is a severe remedy—a step to be avoided whenever possible, and one to

be taken only in circumstances manifesting a necessity therefor." *United States v. Clarke*, 306 U.S.App.D.C. 251, 264, 24 F.3d 257, 270 (1994) (citation and internal quotation marks omitted). The denial of a motion for a mistrial should be reversed only "if the decision appears irrational, unreasonable, or so extreme that failure to reverse would result in a miscarriage of justice." *Bragdon v. United States*, 668 A.2d 403, 405 n. 2 (D.C.1995) (citation omitted). Parker has made no such showing.

First, Parker's present contention regarding Juror 700 was seriously undermined by defense counsel's request to have her substituted as a deliberating juror. *See Brown v. United States*, 627 A.2d 499, 508 (D.C.1993) ("a defendant may not take one position at trial and a contradictory position on appeal"); *Mitchell v. United States*, 569 A.2d 177, 180 (D.C.) ("appellant is bound by the position that his counsel took at trial"), *cert. denied*, 498 U.S. 986, 111 S.Ct. 521, 112 L.Ed.2d 532 (1990). In any event, that request was denied. Juror 700 remained an alternate and was dismissed when the other jurors retired to deliberate. The remaining jurors assured the court that they could consider the case impartially, and there is no reason to believe that their answers were untruthful. On this record, we see no basis for concluding that the concerns of an alternate juror who did not even participate in the deliberations somehow tainted the ultimate verdict.

Second, Wilson's testimony about the phone calls he received from Donald Gatling does not warrant reversal. The matter of the phone calls was first raised by defense counsel on cross-examination.[11] "Thus the error that occurred, if any, was invited by defense counsel." *Gonzalez v. United States*, 697 A.2d 819, 826 (D.C. 1997). It is well established that a defendant "cannot well complain of being preju-

---

11. At one point counsel referred to "Donald Wilson," but this was obviously a mistake because, moments later, he referred to the same person as "Don Don," which was Donald Gatling's nickname.

diced by a situation which [he] created." *Laney v. United States,* 54 App.D.C. 56, 60, 294 F. 412, 416 (1923).[12] It was not until later, on redirect, that the prosecutor delved further into the subject matter of the calls. *See Hilton v. United States,* 435 A.2d 383, 389 (D.C.1981) ("the scope of the redirect examination is limited to matters which were initially raised on cross-examination"). Most significantly, defense counsel made no objection to the redirect examination and never moved for a mistrial based on the phone calls. To win reversal on this ground, therefore, he must demonstrate plain error, and we conclude that he has not done so. *See United States v. Olano,* 507 U.S. 725, 734, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993); *Watts v. United States,* 362 A.2d 706, 709 (D.C.1976) (en banc) (defining plain error).

 Third, Parker's contention that Juror 293 was prejudiced because she received two collect calls from an unknown person at the D.C. Jail, which she did not accept, is unsupported by the record. Juror bias may not be presumed. *Smith v. Phillips,* 455 U.S. 209, 215, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982); *Harris v. United States,* 606 A.2d 763, 767 n. 8 (D.C.1992). When there is a claim of juror partiality, "the remedy ... is a hearing in which the defendant has the opportunity to prove actual bias." *Smith v. Phillips,* 455 U.S. at 215, 102 S.Ct. 940; *Shannon & Luchs Management Co. v. Roberts,* 447 A.2d 37, 41 (D.C.1982); *see also Washington v. Washington Hospital Center,* 579 A.2d 177, 184–185 (D.C.1990) ("a party claiming prejudice from such contact is not entitled to a mistrial without more"). In this case, the trial judge held such a hearing and questioned the juror about the calls, and she assured him and counsel that the calls would not affect her decision. Defense counsel then asked the juror whether she believed the calls were from somebody associated with the defendant, and she said, "No, I mean, why would I believe that?" Counsel also asked whether the juror was frightened, and she replied, "No, sir, I'm not." In deciding to leave Juror 293 on the jury, the trial judge necessarily made an implicit finding that her responses to his questions and those of defense counsel were worthy of belief. As an appellate court, reviewing a cold record, we are in no position to second-guess such a finding. *See Smith v. Phillips,* 455 U.S. at 217 n. 7, 102 S.Ct. 940 (jurors are qualified to say whether they are unbiased).

In *Letsinger v. United States,* 402 A.2d 411 (D.C.1979), this court held that in criminal cases "[e]xtra-judicial communications to a juror ... immediately raise a presumption that they are prejudicial to the defendant, and the government bears the burden of establishing the harmlessness of such contact." *Id.* at 417 (citations omitted). If the government does not meet its burden, then the court is obliged to declare a mistrial. *Id.* Since the trial court is in the best position to evaluate such matters, however, we review its decision only for abuse of discretion. *See Medrano–Quiroz v. United States,* 705 A.2d 642, 649–650 (D.C.1997). Given the steps taken by the trial court and the juror's own statements indicating that she was not biased against Parker, *see Smith v. Phillips,* 455 U.S. at 217 n. 7, 102 S.Ct. 940, we can find no such abuse. *See Darab v. United States,* 623 A.2d 127, 141 (D.C. 1993); *Washington v. Washington Hospital Center,* 579 A.2d at 184–185; *Letsinger,* 402 A.2d at 418. We therefore hold that the court committed no error in failing to declare a mistrial.

## III

Parker argues next that the trial court erroneously limited his counsel's recross-

---

12. Moreover, Parker fails to mention that Gatling was a defense witness whose identity the defense chose not to disclose until his name first came up in the cross-examination of Darrick Wilson. Although it is apparent from the record that the prosecutor knew about Ga- tling and the phone calls he made to Wilson from the jail, those phone calls never became relevant until defense counsel asked Wilson on cross-examination about a statement he allegedly made to Gatling.

examination of Darrick Wilson and his cross-examination of Detective Lanauze. Once again we find no abuse of discretion and thus no basis for reversal.

 The right to cross-examine is a fundamental right guaranteed by the Confrontation Clause of the Sixth Amendment. *Flores v. United States*, 698 A.2d 474, 479 (D.C.1997); *Akins v. United States*, 679 A.2d 1017, 1028 (D.C.1996); *Singletary v. United States*, 383 A.2d 1064, 1073 (D.C. 1978). But that right is not unfettered. *Flores*, 698 A.2d at 479; *Scull v. United States*, 564 A.2d 1161, 1164 (D.C.1989); *Waller v. United States*, 389 A.2d 801, 810 (D.C.1978), *cert. denied*, 446 U.S. 901, 100 S.Ct. 1824, 64 L.Ed.2d 253 (1980). The trial court has discretion to limit its scope so as "to keep cross-examination to its primary purpose and to maintain orderly, expeditious, and relevant presentation of the evidence to the trier of fact." *Letsinger*, 402 A.2d at 415.[13] Moreover, there is no constitutional right to recross-examine a witness, and "the extent of recross-examination is discretionary and may be strictly limited by the trial court." *Singletary*, 383 A.2d at 1073 (citations omitted).

 Following the redirect examination of Darrick Wilson, defense counsel sought to ask him on recross whether Donald Gatling, in one of their telephone conversations, had told him to "stop lying and tell the truth." Counsel then told the court that he could explore this issue with either Wilson or Gatling—thereby acknowledging that recross-examination of Wilson would be either irrelevant or repetitious. On this record we can find no abuse of discretion in the court's refusal to allow the defense to elicit Gatling's alleged statement through the recross-examination of Wilson.

 Later, during the cross-examination of Detective Lanauze, defense counsel sought to impeach Wilson's testimony by asking the detective about possible inconsistencies between Wilson's testimony and his written statement, which had been typed by Detective Lanauze.[14] Initially, over the government's objection, counsel brought out that although Wilson had told Detective Lanauze about the shooting both in the hospital and at the police station a short time after the incident, he did not mention that the second person had uttered an obscene threat, as he had testified on direct, nor did he say anything about an attempted robbery. Counsel then attempted to ask whether Wilson, in his written statement, had said that he "grabbed" his cousin before he started running. The government objected again, and this time the court sustained the objection. The court reasoned that since Wilson had not been questioned either on direct or on cross about whether he "grabbed" his cousin, defense counsel could not establish this inconsistency through Detective Lanauze's testimony.

 "[A] party seeking admission of a witness' prior inconsistent statement must first confront that witness with the prior statement and give [him] an opportunity to explain it." *Scott v. United States*, 619 A.2d 917, 921 (D.C.1993). Since defense counsel did not confront Wilson with these supposed inconsistencies when Wilson was on the stand, the trial court was correct in ruling that counsel could not bring them out by cross-examining Detective Lanauze.

## IV

Parker argues that his conviction must be reversed because of an improper comment made by the prosecutor in her open-

---

13. "The principal purpose of cross-examination is to probe the credibility of the witness and the truthfulness of his testimony ... [and] not to present one's own case." *Letsinger*, 402 A.2d at 415 (citation omitted).

14. It is clear from the record that defense counsel knew of the written statement while he was cross-examining Wilson, for he questioned Wilson about some of the inconsistencies between the statement and his testimony.

ing statement and repeated in her closing argument. Specifically, the prosecutor began her opening by saying, "Ladies and gentlemen, what is a human life worth? To this man, Thurman Parker, a human life is worth nothing." Defense counsel immediately objected, but the court overruled the objection. Later, in her summation at the end of the trial, the prosecutor said:

> Ladies and gentlemen, just about three or four days ago, I started this trial by asking you the question, "What is a human life worth?" Perhaps an unfathomable question, a question that doesn't have an answer. But I answered, to this man, Thurman Parker, a human life has absolutely no worth, it was worth absolutely nothing.
>
> Perhaps when I said that, you all thought it was exaggeration or hyperbole, just trying to get emotions up. But there's no real other answer. Because if Mr. Parker valued human life, could he have pointed a gun at Eric Robinson and Darrick Wilson? Could he have shot numerous times at Darrick Wilson and Eric Robinson? And could he have shot Eric Robinson in the back while he ran away from him? Does that indicate a person who values human life or a person who considers life worth absolutely nothing?

Defense counsel did not object to these remarks. Consequently, "the question presented is whether the judge abused his discretion by failing to intervene *sua sponte* in the prosecutor's argument." *Mills v. United States,* 599 A.2d 775, 787 (D.C.1991); *accord, e.g., Hunter v. United States,* 606 A.2d 139, 145 (D.C.), *cert. denied,* 506 U.S. 991, 113 S.Ct. 509, 121 L.Ed.2d 444 (1992).

▮▮▮▮ When reviewing a claim of improper comments by a prosecutor, this court "must first determine whether any of the challenged comments were improper." *Freeman v. United States,* 689 A.2d 575, 585 (D.C.1997) (citations omitted). If they were, "we must then, viewing the remarks

in context, 'consider the gravity of the [impropriety], its relationship to the issue of guilt, the effect of any corrective action by the trial judge, and the strength of the government's case.'" *McGrier v. United States,* 597 A.2d 36, 41 (D.C.1991) (citation omitted). If there was no objection at trial, the conviction may be reversed "only in a 'particularly egregious' case, when 'a miscarriage of justice would otherwise result.'" *Id.* (citing *United States v. Young,* 470 U.S. 1, 15, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985)). Furthermore, when an objection has been overruled at an earlier stage of the trial and the circumstances change as the trial progresses, the defendant must renew the objection on the basis of the changed circumstances in order to preserve the claim of impropriety for appeal. *Medrano–Quiroz,* 705 A.2d at 648. Finally, even if the claim is properly preserved, reversal is warranted only when the defendant has suffered substantial prejudice. *Freeman,* 689 A.2d at 584; *McGrier,* 597 A.2d at 41.

A prosecutor may, and should, prosecute "with earnestness and vigor." *Berger v. United States,* 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935); *accord, Irick v. United States,* 565 A.2d 26, 36 (D.C.1989). The government "need not sanitize [its] evidence or cleanse it of its emotional impact." *Id.* (citing *Powell v. United States,* 485 A.2d 596, 599 (D.C.1984), *cert. denied,* 474 U.S. 981, 106 S.Ct. 420, 88 L.Ed.2d 339 (1985)). If the facts of the case have an inherent emotional impact, "[t]he prosecutor [is] under no duty to sugar-coat those facts or to make them less repellent than they actually [are]." *Thacker v. United States,* 599 A.2d 52, 62 (D.C.1991).

▮▮▮▮ The one line of the prosecutor's opening statement about which Parker complains—"what is a human life worth?"—was not improper. In context, this comment cannot reasonably be read as an inflammatory tactic or device designed "to appeal to the passions and fears of the jurors or to seek a verdict reflecting sympathy for the victim." *Powell,* 485 A.2d at

599. Parker, after all, was charged with first-degree premeditated murder, which required the government to prove, among other things, that he had a specific intent to kill and that he premeditated and deliberated about the act of taking a human life. *See, e.g., Daniels v. United States,* 738 A.2d 240, 245 (D.C.1999); CRIMINAL JURY INSTRUCTIONS FOR THE DISTRICT OF COLUMBIA, No. 4.18 (4th ed.1996). Both of these elements "may be inferred from the facts and circumstances surrounding the killing." *Thacker,* 599 A.2d at 57 (citations omitted). We conclude, therefore, that the prosecutor's comment can reasonably be read as simply an attempt to focus the jury's attention on evidence from which they could infer Parker's state of mind. *See McGrier,* 597 A.2d at 48–49; *Jefferson v. United States,* 558 A.2d 298, 302 (D.C. 1989), *cert. denied,* 493 U.S. 1032, 110 S.Ct. 748, 107 L.Ed.2d 765 (1990); *see also Donnelly v. De Christoforo,* 416 U.S. 637, 647, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974) ("a court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning").

As for the closing argument, this court has repeatedly held that a prosecutor may permissibly argue what the defendant was "probably thinking" or "knew in his heart" when such an inference can reasonably be drawn from all the evidence. *E.g., McGrier,* 597 A.2d at 48–49; *Irick,* 565 A.2d at 37; *Jefferson,* 558 A.2d at 302. In this case the evidence showed that Parker, without provocation, shot at two unarmed and fleeing men from behind, killing one and wounding the other. From this evidence it was certainly reasonable for a jury to infer—and thus for counsel to suggest that a jury might infer—that Parker did not value human life. We hold, accordingly, that the comments during the prosecutor's closing argument, to which defense counsel did not even object, were rooted in the evidence and were therefore permissible.

## V

The judgment of conviction is affirmed on the merits. The case is remanded to the trial court with directions to vacate one of the two murder convictions. If the court elects to vacate the premeditated murder conviction and to let the felony murder conviction stand, it shall also vacate the conviction of the underlying felony, attempted robbery while armed. *See Thacker,* 599 A.2d at 63. If the court elects instead to vacate the felony murder conviction and to let both the premeditated murder conviction and the attempted robbery while armed conviction stand, it shall also vacate the conviction of assault with a dangerous weapon, which (the government agrees) merges with the conviction of attempted robbery while armed. *See Simms v. United States,* 634 A.2d 442, 447 (D.C.1993). The court, in its discretion, may also vacate the sentence on any other count or counts and resentence Parker in order to effectuate its original sentencing scheme. *See Thorne v. United States,* 471 A.2d 247, 249 (D.C.1983).

*Affirmed on the merits, remanded in part for resentencing.*