Duane DONALDSON, Appellant,

v.

UNITED STATES, Appellee.

No. 01–CF–616.

District of Columbia Court of Appeals.

Argued May 27, 2004.

Decided July 22, 2004.

Michael Starr, Public Defender Service, with whom James Klein and Jennifer Lanoff, Public Defender Service, were on the brief, for appellant.

Ann K.H. Simon, Assistant United States Attorney, with whom Roscoe C. Howard, Jr., United States Attorney at the time, and John R. Fisher, Roy W. McLeese III, and Matthew G. Olsen, Assistant United States Attorneys, were on the brief, for appellee.

Before STEADMAN, FARRELL, and WASHINGTON, Associate Judges.

STEADMAN, Associate Judge:

Appellant, Duane Donaldson, appeals from his conviction for voluntary man-

slaughter, in violation of D.C.Code § 22–2405 (1981) (recodified as D.C.Code § 22–2105 (2001)).[1] He argues that the trial court committed two instructional errors by: (1) refusing to provide the jury a "criminal negligence" involuntary manslaughter instruction and (2) instructing the jury to consider involuntary manslaughter only after making "reasonable efforts" in its consideration of voluntary manslaughter.[2] We affirm.

## I. Facts

### A. *The Altercation*

Appellant spent the early evening of Friday, November 13, 1998, at his home, socializing and drinking with James Tenor and Lamont Reynolds, the decedent. After Mr. Tenor had departed, Mr. Reynolds made sexual advances toward appellant. Appellant rejected such advances, but Mr. Reynolds "touched [appellant's] crotch area several times." Appellant informed Mr. Reynolds that he was not gay, retrieved Mr. Reynolds' coat and began to walk him toward the door.

Later Mr. Tenor heard screaming outside his home, which was located on a street that intersected the street where appellant lived, about ten houses away from appellant's house. Once outside, Mr. Tenor saw Mr. Reynolds, covered with blood, slumped in a chair on the front porch. Mr. Tenor contacted emergency personnel. When the police arrived, Mr. Reynolds stated that "Wayne" had tried to kill him. Mr. Reynolds told officers that he had made sexual passes toward appel-

lant because he believed appellant was gay, but appellant refused those advances and "punched him about the face and kicked him several times."

Police proceeded to appellant's residence and inquired whether he had been involved in an altercation. Appellant admitted to "striking [Mr. Reynolds] once and possibly pushing him to the ground" following Mr. Reynolds' sexual advances. Officer Juan Burford informed appellant that Mr. Reynolds' injuries appeared too severe to have resulted from a single punch. Appellant responded that the other injuries "probably happened from when he fell."[3]

Neither appellant nor Mr. Reynolds indicated the precise location of the altercation. Officer Burford testified that he got the impression the altercation happened in appellant's basement as appellant was attempting to get Mr. Reynolds out of the house.[4] In contrast, Officer Robert Ingram, who interviewed appellant at the police precinct, testified, "it was [his] understanding [that the altercation] happened outside." Appellant told Officer Ingram that after several advances by Mr. Reynolds he "finally got Mr. Reynolds' coat and walked him out to the front, upstairs, out to the front of the house." Appellant then admitted to Ingram that he "punched [Mr. Reynolds] and he fell... [h]e punched him and he went to the ground."

### B. *The Medical Evidence*

In the meantime, Mr. Reynolds was taken to the hospital. Dr. Mark Buchly testi-

---

1. Appellant was charged with second-degree murder, in violation of D.C.Code § 22–2403 (1981) (recodified at D.C.Code § 22–2103 (2001)).

2. The trial court gave an instruction on "misdemeanor" manslaughter.

3. Officer Burford testified that appellant was "very cooperative. He stated to us why he did

what he did, he—he repeatedly said he only hit the individual one time and he may have pushed him to the ground."

4. Officer Burford also testified that the basement appeared orderly such that there was no sign of an altercation, "nothing to indicate to me that anything out of the ordinary had occurred there."

fied that Mr. Reynolds presented evidence of "blunt injury to the face... [and] left side of the chest and back." He further noted that "his blood pressure was stable, he had an odor of alcohol on his breath,[5] he was complaining of severe pain and difficulty breathing." Mr. Reynolds told Dr. Buchly that he had been "punched several times in the face and kicked multiple times in the chest and back." Dr. Buchly testified that examinations including x-rays and CAT scans revealed swelling on the left side of the head and multiple rib fractures and an abrasion over his knee. He confirmed that the swelling was consistent with being punched in the head. During his examination Dr. Buchly discovered a hole in Mr. Reynolds' lung resulting from his fractured ribs, which required surgery. Over the next few days, Mr. Reynolds' ability to breathe deteriorated, and he was placed on a ventilator system. Mr. Reynolds then contracted a variety of infections, and after three weeks, his heart stopped. Despite resuscitation, he had no brain function and his family chose to discontinue treatment, resulting in his death.

Dr. Marie–Lydie Pierre–Louis opined that Mr. Reynolds' rib fractures could not have been inflicted with one punch. She doubted that a person's fists could cause such injuries, but indicated that even if Mr. Reynolds' injuries could result from a punch "you [would] need more than one anyhow to cause that." She opined that a kick or a stomp could cause such injury. On cross-examination, after being shown photographs of the concrete stairs leading to appellant's door, Dr. Pierre–Louis testified that if Mr. Reynolds had been "pushed with some force against the steps and he [had] fall[en], yes, that [could] cause the injury."

Dr. John Adams testified that Mr. Reynolds' rib injuries were consistent with being kicked. However, he acknowledged that, "[f]alling over an object could produce the same effect." In response to questioning regarding the stairs at appellant's home, Dr. Adams testified, "Especially a person who's intoxicated and therefore doesn't have normal protective reflexes I think it's entirely possible that if he fell backwards from the top, from the porch, and landed across those steps, that could break ribs."

### C. *The Jury Instructions*

At trial, appellant requested an instruction on "criminal negligence" involuntary manslaughter in accordance with Standard Jury Instruction 4.25.B.[6] In furtherance of the request, appellant stated, "it's before ... this jury, with respect to Mr. Donaldson's statement, that he, you know, he hit the guy, and the guy was pushed down, and that could have caused four broken ribs ... the jury could consider that under those circumstances he's not consciously

---

5. Dr. Buchly later testified that tests revealed that Mr. Reynolds was intoxicated when he was brought to the hospital.

6. *See* Criminal Jury Instructions for the District of Columbia, No. 4.25.B (4th ed. revised 2002):

The essential elements of involuntary manslaughter, each of which the government must prove beyond a reasonable doubt, are: 1. That the defendant caused the death of the decedent; 2. That the conduct which caused the death was a gross deviation from a reasonable standard of care; and 3.

That the conduct which caused the death created an extreme risk of death or serious bodily injury. The gist of the difference between second degree murder and involuntary manslaughter is in whether the defendant is aware of the risk. To show guilt of second degree murder, the government must prove the defendant was aware of the extreme risk of death or serious bodily injury. For involuntary manslaughter, the government must prove, not that the defendant was aware of the risk, but that s/he should have been aware of it.

aware that his conduct would create an extreme risk of death or serious bodily injury ... but perhaps he should have been aware. And that's the difference between second degree and involuntary manslaughter." The government objected, arguing the proposed instruction was not appropriate to the facts of the case because "[i]t's a gross negligence [instruction], it's the typical car case where someone drinks a lot and drives across the center line and murder results ... this was an intentional act, not that he was driving a car and should have been more careful, but rather that he had an intent to injure the victim, and he acted in accordance with that intent." In refusing to give the instruction, the trial court agreed with the government, stating, "I don't see any evidence that would support any other theory except that that was intentional behavior on the part of the defendant. So I don't believe that [instruction] would be appropriate in this case."[7] The trial court did, however, provide the jury an instruction as to misdemeanor involuntary manslaughter: "the essential elements of involuntary manslaughter ... are as follows: One, that the defendant caused the death of the decedent. Two, that he did so while committing or attempting to commit assault. And that he committed or attempted to commit assault in a manner that created a reasonably foreseeable risk of appreciable injury."[8]

Appellant also requested that the jury be given "a reasonable efforts instruction,"

at least as to second-degree murder. Specifically, appellant stated:

As they first consider second degree murder, then after that if they've reached a verdict of not guilty on second degree murder or after a reasonable efforts they can't reach a verdict they can consider voluntary manslaughter and then two sorts, two types of involuntary manslaughter. And the jury has to be made—has to be made clear to the jury that in essence, you know, all those manslaughters, the voluntary and the two types of involuntary manslaughter, are in equipoise ... one should not be considered before the other ... because one is not a lesser, the involuntary is not ... a lesser.

The trial court disagreed, "I don't think it makes any difference as to the order in which they ... they are in equipoise .... But I think they ought to have an order in which to do that. I mean just consider one ... and don't consider the others until you made reasonable efforts to arrive at a verdict ... otherwise ... it becomes chaotic." Appellant objected, "if the Court instructs them to consider one of the types of manslaughter before the other, the Court is, at least by implication, suggesting that that is kind of a more serious crime than the other ... they can pick the order in which they consider them." The government interjected that "there's a logical reason why the jury may be instructed to consider voluntary manslaughter before it considers involuntary manslaughter, and that is be-

---

7. The trial court indicated, however, that the ruling was preliminary and it would consider the matter further. Appellant later repeated his request, "the Court indicated it was going to further consider the other involuntary manslaughter [instruction]." At that point, the trial court ruled "I believe that [Standard Criminal Jury Instruction] 4.24 as to the alternative number C would be more appropriate in this particular case. So I don't see ... any change in that particular matter at this time."

8. In conformance with the District's standard jury instructions, the court instructed the jury that "[a] foreseeable risk of appreciable injury exists when physical injury is a possible consequence of the manner in which the crime is committed or attempted. The government need not prove that the defendant specifically intended to kill or injure the decedent." *See* Criminal Jury Instructions, *supra* note 6, No. 4.24.C.

cause voluntary—to find voluntary manslaughter all the jury has to find is that it's a second degree murder but there's mitigation ... it falls easily within a logical way of thinking about the evidence." The trial court determined that "that's the way I think it should be done ... the first step down from second degree ... is voluntary." Accordingly, the trial court instructed the jury:

Now in this case the defendant is charged with second degree murder. I am going to instruct you on this charge and also the lesser-included offenses of voluntary and involuntary manslaughter .... Now you should consider first whether the defendant is guilty of second degree murder. If you find the defendant guilty of second degree murder do not go on to consider manslaughter. If you find the defendant not guilty go on to consider voluntary manslaughter. Or if after making all reasonable efforts to reach a verdict you are not able to do so you are allowed to consider voluntary manslaughter. If you find the defendant guilty of voluntary manslaughter do not go on to consider involuntary manslaughter. Or if after making all reasonable efforts to reach a verdict you are not able to do so you are allowed to consider involuntary manslaughter.

## II. Criminal Negligence Involuntary Manslaughter Instruction

### A. *Error*

■ "A lesser-included offense instruction is warranted when '(1) all elements of the lesser offense are included within the offense charged, and (2) there is a sufficient evidentiary basis for the lesser charge.' " *Boykins v. United States*, 702 A.2d 1242, 1250 (D.C.1997) (quoting *Rease v. United States*, 403 A.2d 322, 328 (D.C. 1979)). Involuntary manslaughter is a lesser-included offense of second-degree murder. *See id.*

■ To show a sufficient evidentiary basis for a lesser-included charge, the burden on the defendant is not onerous. The instruction must be provided if there is "evidence, however weak, sufficient to support a conclusion that the defendant is guilty of the lesser rather than the greater offense." *Comber v. United States*, 584 A.2d 26, 54 (D.C.1990) (en banc) (citing *Graves v. United States*, 490 A.2d 1086 (D.C.1984) (en banc)). "[T]he *weight* of the evidence supporting the instruction is immaterial; as long as a jury could rationally convict on the lesser-included offense after crediting the evidence, the court must give the instruction no matter how inclined it might be to discount that evidence." *Shuler v. United States*, 677 A.2d 1014, 1017 (D.C.1996) (emphasis in original).

■ "[A] homicide constitutes voluntary manslaughter where the perpetrator kills with a state of mind which, but for the presence of legally recognized mitigating circumstances, would render the killing murder" whereas, involuntary manslaughter occurs when a killing is committed without "a specific intent to kill or do serious bodily injury, or ... conscious disregard of an extreme risk of death or serious bodily injury." *Comber, supra,* 584 A.2d at 42, 47. Specifically, "[t]he intent necessary to prove criminal negligence involuntary manslaughter is a 'lack of awareness or failure to perceive the risk of injury from a course of conduct under circumstances in which the actor should have been aware of the risk.' Thus, where the accused was aware of the risk of harm, but acted in conscious disregard of it, the killing is murder or voluntary manslaughter, and where the accused is not aware of the risk of harm, but should have been, the killing will be involuntary manslaughter."

*Boykins, supra,* 702 A.2d at 1250–51 (quoting *United States v. Bradford,* 344 A.2d 208, 214 (D.C.1975)) (other citations omitted). The offense of involuntary manslaughter is not limited to those killings in which the perpetrator did not intend the conduct which caused the death, but encompasses those where the conduct was intentionally committed by an actor who should have been, but was not, aware of the risk of death or serious bodily injury. *Comber, supra,* 584 A.2d at 53. In ruling that appellant was not entitled to that involuntary manslaughter instruction because there "was intentional behavior on the part of the defendant," the trial court committed the very error we addressed in *Comber.*

Evidence was presented at trial that the altercation occurred once the parties were outside appellant's home. A photograph showed concrete stairs leading to appellant's door. Several doctors testified that Mr. Reynolds' injuries could have been sustained in a fall down such stairs. Appellant told police he punched Mr. Reynolds and may have pushed him, and that Mr. Reynolds might have sustained his non-facial injuries, "when he fell." In supporting his requested instruction, appellant directed the court's attention to such evidence, stating, "Mr. Donaldson[ ] ... hit the guy, and the guy was pushed down, and that could have caused four broken ribs ... the jury could consider that under those circumstances he's not consciously aware that his conduct would create an extreme risk of death or serious bodily injury ... but perhaps should have been aware. And that's the difference between second degree murder and involuntary manslaughter." This evidence was suffi-

cient to warrant a criminal negligence involuntary manslaughter instruction. *Cf. Comber, supra,* 584 A.2d at 32–33, 53–55 (where evidence showed that appellant Comber punched Pickney once or twice, resulting in Pickney's death, and that appellant Hayward twice punched Butler and Butler twice fell and hit his head and then died, both appellants were entitled to an involuntary manslaughter instruction).[9]

### B. *Reversibility*

■ Finding error in the trial court's refusal to give the criminal negligence involuntary manslaughter instruction, we now evaluate whether such error requires a new trial in this case. The Supreme Court has recognized that the refusal to provide a lesser-included offense instruction may leave the jury with only two alternatives: conviction of the "greater" offense or acquittal. "[T]he unavailability of the third option of convicting on a lesser included offense may encourage the jury to convict for an impermissible reason—its belief that the defendant is guilty of some serious crime and should be punished ...." *Beck v. Alabama,* 447 U.S. 625, 642, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980). Consistent with such concern, we have found the erroneous refusal to provide a lesser-included offense instruction to be reversible error on numerous occasions. *See, e.g., Brockington v. United States,* 699 A.2d 1117 (D.C.1997) (possession instruction denied); *Shuler, supra* (second degree murder instruction denied); *Moore v. United States,* 599 A.2d 1381 (D.C.1991) (assault instruction denied); *Comber, supra* (involuntary manslaughter instruction denied).

In each of our reversing cases, however, the jury had no "lesser" offense for which

---

9. As in this case and in *Comber,* this will mean that many cases involving death caused by an assault will warrant a criminal negligence involuntary manslaughter instruction upon request of either party. *Cf. Woodard v.* *United States,* 738 A.2d 254, 258 n. 9 (D.C. 1999) ("trial courts should not instruct on a lesser-included offense unless a party requests such instruction").

it could convict the defendant.[10] The "fundamental concern in *Beck*" was "the all-or-nothing nature of the decision with which the jury was presented" and that " '[t]he absence of a lesser included offense instruction increase[d] the risk that the jury ... [would] convict ... simply to avoid setting the defendant free.'" *Schad v. Arizona*, 501 U.S. 624, 646, 111 S.Ct. 2491, 115 L.Ed.2d 555 (1991) (quoting *Spaziano v. Florida*, 468 U.S. 447, 455, 104 S.Ct. 3154, 82 L.Ed.2d 340 (1984)). Such concern does not exist where, as here, the "jury [is] not faced with an all-or-nothing choice between the [greater] offense ... and innocence." *Id.* at 647, 111 S.Ct. 2491. An intermediate option between the greater offense and acquittal diminishes the harm in any error because it would be remarkable for the jury, believing a defendant to be not guilty of the greater offense but guilty of an uncharged offense, to nonetheless convict the defendant of the greater offense even though a significant lesser offense is available to the jury. *Cf. Moore, supra,* 599 A.2d at 1387 (In reversing for error, we noted, "[i]n *Schad,* the jury was not left with the choice of acquit-

ting the defendant altogether and finding him guilty of first degree murder. Rather, it had a third option of convicting him of the lesser included offense of second degree murder. In the present case, the jury was compelled either to acquit Moore on the mayhem charge or to find him guilty as charged. No intermediate option was available.") (footnote omitted). In the case at bar, rather than an all-or-nothing choice of second-degree murder or acquittal, the jury had before it the intermediate options of both voluntary and "misdemeanor" involuntary manslaughter.

Appellant contends that the absence of the "criminal negligence" involuntary manslaughter instruction denied the jury the opportunity to consider the offense most consistent with appellant's theory of the evidence. Such denial, argues appellant, could have contributed to the jury's finding of guilt for voluntary manslaughter. The Supreme Court rejected precisely such an argument in *Schad*.[11] The fact that the jury's intermediate option is a different lesser-included offense than desired by the defendant does not diminish the reliability of the jury's conviction on a "greater" offense.[12] We will not assume, as appellant's

10. In *Comber,* unlike here, the trial court erroneously instructed the jury regarding *both* voluntary manslaughter and involuntary manslaughter. For voluntary manslaughter, the trial court did not provide a mental state for Hayward's instruction and for Comber, instructed the jury that it could "find him guilty if it found only that he intended to commit some act which resulted in death" rather than requiring the jury to find the appellants to have intended to kill, intended to inflict serious bodily injury, or acted in conscious disregard of an extreme risk of death or serious bodily injury. *Comber, supra,* 584 A.2d at 52–54. Regarding involuntary manslaughter, the trial court erroneously instructed the jury that Comber could be found guilty only if he did not intend to commit the death causing act and refused the instruction for Hayward altogether. Reversal was warranted because both men received erroneous instructions, which incorrectly reduced the level of intent

required for the crime of which they were ultimately convicted. Here, appellant received correct instructions on both voluntary manslaughter and misdemeanor involuntary manslaughter.

11. The Court's rejection of such a theory was predicated on the fact that the jury was instructed on a lesser-included offense that was actually supported by the evidence. *Schad, supra,* 501 U.S. at 648, 111 S.Ct. 2491 (noting that *Beck* would not "be satisfied by instructing the jury on just any lesser included offense, even one without any support in the evidence").

12. While it is true that criminal negligence involuntary manslaughter is not a lesser-included offense of voluntary manslaughter, and therefore the jury did not convict appellant of a technically "greater" offense than the offense appellant requested be presented

theory requires, that the jury, believing appellant to be not guilty of second-degree murder, voluntary manslaughter, or misdemeanor involuntary manslaughter, but guilty of a reckless act (i.e. criminal negligence involuntary manslaughter) was "loath to acquit him completely" and, thus, chose voluntary manslaughter rather than misdemeanor involuntary manslaughter "as its means of keeping him off the streets." *Schad, supra,* 501 U.S. at 647, 111 S.Ct. 2491; *see also Outlaw v. United States,* 806 A.2d 1192, 1200–01 (D.C.2002) ("Although the trial court did not give a self-defense instruction, it instructed the jury on mitigation of malice or intent, and the defense of imperfect self-defense. Despite these instructions, the jury returned a second-degree murder verdict, which is inconsistent with imperfect self-defense. If the jury rejected the imperfect self-defense theory, it is logical to conclude that it would also reject the full self-defense theory. Consequently, even assuming error due to the failure to give a self-defense instruction, the error would be harmless.") (citing *Schad, supra,* 501 U.S. at 647–48, 111 S.Ct. 2491) (footnote omitted). Moreover, the jury was not presented here with two extreme choices of an extraordinarily serious conviction, on the one hand, and an inconsequential slap on the wrist, on the other, separated by a vast chasm that a criminal negligence involuntary manslaughter instruction would have bridged. As our opinion in *Comber* explores at length, manslaughter considered as a whole is a lesser-included offense of

murder. The distinction between voluntary and involuntary manslaughter is in the state of mind of the defendant. In voluntary manslaughter, the defendant acts with murderous intent, but his acts are mitigated to voluntary manslaughter. In involuntary manslaughter, the defendant does not act with murderous intent but he is held liable nonetheless either because his reckless acts involved an extreme risk or because his acts were in violation of some other criminal statute and created a foreseeable risk of appreciable injury. Thus, just as murder may be committed either by a conscious disregard of an extreme risk or in the commission of an enumerated felony, so involuntary manslaughter as a single offense may be committed by performing death producing acts either where the defendant is not aware of their extreme risk or in the course of the commission of some other criminal offense short of the enumerated felonies.[13] Conviction of involuntary manslaughter on the latter ground is hardly insignificant. The court properly directed the jury that in order to convict the appellant of misdemeanor involuntary manslaughter, it had to find both "that the defendant caused the death of the decedent ... while committing or attempting to commit assault. *And that* he committed or attempted to commit assault in a manner that created a reasonably foreseeable risk of appreciable injury." Moreover, the trial court did not identify the charge as "misdemeanor" involuntary manslaughter to the jury. The customary designation of the crime as "misdemeanor" involuntary manslaughter hardly renders the crime a minor one.[14]

to the jury, we have said that "voluntary manslaughter is typically deemed a more serious offense than involuntary manslaughter." *Comber, supra,* 584 A.2d at 53 n. 46. Thus, in this context, the jury's conviction of appellant for voluntary manslaughter occurred in the face of the less serious alternative of involuntary manslaughter, which required a lower level of intent on the part of the appellant than voluntary manslaughter.

**13.** Of course, as in *Comber* and here, a criminal assault that results in death may well fall within both categories. 584 A.2d at 54.

**14.** As we noted in *Comber,* the two elements of involuntary manslaughter were derived from the common-law principle that unintentional acts resulting in death were not excused and were thus manslaughter where the killings occurred "in the course of lawful acts carried out in an unlawful, i.e., criminally

*Cf. Comber, supra,* 584 A.2d at 49 n. 33 ("Although we use the phrase 'misdemeanor-manslaughter rule' in this opinion, we recognize that the term may be something of a misnomer, in that felonies which might not otherwise suffice to give rise to felony murder liability ... might serve as a basis for 'unlawful act' involuntary manslaughter liability."). In light of the jury's conviction of appellant for voluntary manslaughter, in the face of a "misdemeanor" involuntary manslaughter instruction, the trial court's error in refusing to instruct on the alternate basis for involuntary manslaughter does not constitute grounds for a new trial.

### III. Order of Consideration

 Appellant also argues that the trial court erred by directing the jury to first make reasonable efforts to reach a verdict on the voluntary manslaughter charge before considering involuntary manslaughter. In *Comber,* 584 A.2d at 53 n. 46, we said:

"[I]f the [trial] Court allows the Government to go to the jury on both [voluntary and involuntary manslaughter] counts, it should not be in the nature of lesser-included offenses but instead in the nature of legally inconsistent counts which will require the alternative verdict instruction." The trial court accordingly should not instruct the jury that it may consider involuntary manslaughter only if it has acquitted appellant of the greater offense of voluntary manslaughter. Because voluntary manslaughter is typically deemed a more serious offense than involuntary manslaughter, however, the trial court may direct the jury to consider voluntary manslaughter first in its deliberations. [quoting *Bradford, supra,* 344 A.2d at 218; other citations omitted; alteration in original].

While both voluntary and involuntary manslaughter are lesser-included offenses of second degree murder, we specifically acknowledged that voluntary manslaughter is "a more serious offense than involuntary manslaughter." *Id.* As already discussed above, this is because involuntary manslaughter is committed with a lower level of intent than voluntary manslaughter. *See* Criminal Jury Instructions, *supra* note 6, Nos. 4.20.A–B, 4.22.III, and 4.24.A; *Comber, supra,* 584 A.2d at 42–43, 48–52 (Voluntary manslaughter is only distinguishable from second degree murder through a finding of the existence of adequate provocation or other mitigation. Involuntary manslaughter consists of a completely different state of mind, requiring the government only to prove either that the defendant should have been aware of an extreme risk of death or serious bodily injury or that the defendant caused the death of the decedent during the commission of a misdemeanor in a manner that was dangerous and that, under the circumstances, created a foreseeable risk of appreciable injury.). Thus, in *Comber,* we held that, although it may not give an acquit-first instruction, "the trial court may direct the jury to consider voluntary manslaughter first in its deliberations." 584 A.2d at 53 n. 46.

Appellant's primary contention to the trial court was and the essence of appellant's argument to us is that the court's instruction intimated that involuntary manslaughter is a lesser-included offense of rather than an alternative offense to voluntary manslaughter, and that the trial court, therefore, should not have directed the jury to consider the lesser-included offenses of voluntary and involuntary man-

---

negligent fashion" or "in the course of unlawful, i.e., criminal acts." 584 A.2d at 48. Involuntary manslaughter applies in the latter case even where the defendant does not act with the degree of recklessness required for

criminal negligence manslaughter because "the defendant's intentional commission of a misdemeanor supplies the culpability required to impose homicide liability." *Id.* at 49–50.

slaughter in any particular order. However, the trial court identified both voluntary and involuntary manslaughter as lesser-included offenses of second degree murder by explicitly stating to the jury, "I am going to instruct you on this charge [second degree murder] and also the lesser-included *offenses* of voluntary and involuntary manslaughter." In addition, appellant's argument regarding the ordering of offenses directly contradicted this court's holding in *Comber* that the trial court may instruct the jury to consider voluntary manslaughter first. *Comber, supra,* 584 A.2d at 53 n. 46. Finally, to the extent that appellant wanted an express instruction as to the precise relationship between voluntary and involuntary manslaughter, he proposed no specific language regarding such "equipoise" to the trial court. *Cf. Russell v. United States,* 698 A.2d 1007, 1012 (D.C.1997) ("a party's request for jury instructions must be made with sufficient precision to indicate distinctly the party's thesis").

 In this case, the trial court did not give the jury an impermissible acquittal first instruction. Furthermore, the court committed no error in instructing the jury to consider voluntary manslaughter before involuntary manslaughter as *Comber* explicitly permitted the court to do just that. 584 A.2d at 53 n. 46. The only remaining question, then, is whether the "reasonable efforts" element of the court's instruction was permissible.

Appellant did not object to the "reasonable efforts" language. In fact, appellant specifically requested such an instruction, at least as to second-degree murder:

> I would actually ask for the reasonable efforts instruction. Hoping that if he gets convicted the government is not going to come back with a second degree—go forward on a second degree murder even given the recent case, says they can do that. But I would ask for a

reasonable efforts instruction. As they first consider second degree murder, then after that if they've reached a verdict of not guilty on second degree murder or after reasonable efforts they can't reach a verdict they can consider voluntary manslaughter and then two sorts, two types of involuntary manslaughter.

It is true that with respect to the consideration of voluntary and involuntary manslaughter, appellant asked that the trial court not give any instruction as to the order in which the jury might consider the various types of manslaughter. As already indicated, that request was contrary to *Comber.* Appellant made no specific objection to the inclusion of the same "reasonable efforts" language that he had asked for with respect to second-degree murder, nor did he propose any alternative language to guide the jury. *See* Super. Ct.Crim. R. 30. Accordingly, we review for plain error and find none. *Cowan v. United States,* 629 A.2d 496, 502 (D.C. 1993). Appellant has not demonstrated "a clear showing of a miscarriage of justice." *Id.* Indeed, it is not readily apparent what instruction could be given to a jury permissibly directed to consider the voluntary manslaughter charge first that would be meaningfully helpful to the jury but would not employ the equivalent of a "reasonable efforts" concept. In any event, appellant did not proffer any.

Accordingly, for the foregoing reasons, we affirm the judgment of the trial court.

*Affirmed.*