**John I. STROZIER, Appellant,**

v.

**UNITED STATES, Appellee.**

Nos. 05–CF–1002, 07–CO–472, 08–CO–643.

District of Columbia Court of Appeals.

Argued June 24, 2008.
Resubmitted Nov. 24, 2008.*
Decided March 25, 2010.

---

* The court heard oral argument on appeal nos. 05–CF–1002 and 07–CO–472 on June 24, 2008. During argument, appellate counsel represented that he had taken another appeal

from the trial court's denial of a subsequent 23–110 motion (08–CO–643) that he had filed during the pendency of the previous appeals.

On August 18, 2008, the court consolidated all three appeals. Supplemental briefing was completed on November 24, 2008.

 

Brian W. Stolarz, Washington, DC, and Andrew R. McFall for appellant.

Daria J. Zane, Assistant United States Attorney, with whom Jeffrey A. Taylor, United States Attorney at the time the brief was filed, Roy W. McLeese III, Thomas J. Tourish, Jr., and Magdalena Boynton, Assistant United States Attorneys, were on the brief, for appellee in appeal nos. 05–CF–1002 and 07–CO–472. Jeffrey A. Taylor, United States Attorney at the time the brief was filed, Roy W. McLeese III, Florence Pan, Daria J. Zane and Suzanne C. Nyland, Assistant United States Attorneys, were on the brief, for appellee in appeal no. 08–CO–643.

Before RUIZ, Associate Judge, and FARRELL,** and KING, Senior Judges.

RUIZ, Associate Judge:

These are three consolidated appeals of appellant's conviction and the trial court's denial of his two petitions for new trial pursuant to D.C.Code § 23–110. Appellant was charged with second-degree murder while armed (with a hard object),[1] when he punched Billy Sharp in the face, killing him. The jury acquitted appellant of the charged offense, but convicted him of the lesser-included offense of unarmed involuntary manslaughter.[2] Appellant claims that the trial court abused its discretion by admitting two autopsy photographs of the decedent at trial. Appellant claims that trial counsel[3] were ineffective because they failed to call an exculpatory witness and an independent forensic witness, and that the trial court abused its discretion in denying his petitions for a new trial without a hearing. We conclude there is no reversible error and affirm appellant's conviction.

## I. FACTS

Around 10:30 a.m. on November 8, 2003, Richard Adams was standing with several people on 11th and M Streets, N.W., waiting for the liquor store to open. He saw appellant argue with another person, who, he later found out, was named Billy Sharp. According to Adams, Sharp kept pestering appellant, "like man, when you gone [sic] straighten up. When you gone [sic] do that for me. Like he was talking about money, when you gone pay me my money." According to Adams, appellant "acted like I don't know what you talking about, like he didn't know the guy."

When the store opened, Adams and his friends went inside and bought bottles of liquor. Adams testified that Sharp then "ran over to my little crowd . . . and asked us for a drink, so we gave him a drink." He continued, "By the time we gave him a drink he seemed like he was in a rage. Man, I'm gone [sic] get this guy. I'm

---

** Judge Farrell was an Associate Judge of the court at the time of argument. His status changed to Senior Judge on January 23, 2009.

1. D.C.Code § 22–2104(c) (2001).

2. D.C.Code § 21–2105 (2001). Appellant was sentenced to seventy-two months of incarceration, followed by five years of supervised release.

3. Two attorneys from the Public Defender Service represented appellant at trial. Appellant's allegations of ineffective assistance were not directed to any one particular lawyer, so we refer to them generally as "trial counsel."

going do something about it." Sharp then ran after appellant.

Adams saw "when [Sharp] ran up behind [appellant], [appellant] kind of like shrugged around and said man, I don't know what you talking back [sic]. By the time [appellant] turned his back again, he was still coming towards [appellant]. And [appellant] turned around and swung at him, took a swing at him and hit him across the eye." Adams testified that "[Sharp] fell on the ground. I think he fell up against a tree but he fell and hit the ground." Appellant "just went on and walked away, went on about his business." Adams testified that "it happened so quickly," and, although he did not see a weapon, "[l]ooking at the gash [on Sharp], it could have been a pipe, a crow bar, a tire iron.... [But r]eally we didn't never get a chance to see what [appellant] hit him with."[4]

Defense counsel sought to call Sheila Graham as a witness. She had testified before the grand jury that she did not see anything in appellant's hands. But neither the government nor defense counsel was able to locate Graham, and they agreed to introduce the relevant part of her grand jury testimony at trial.

Doctor Wendy Greene, a trauma surgeon at Howard University Hospital, treated Sharp when he was taken to the hospital. According to Dr. Greene, Sharp was not moving and had no heartbeat, and appeared to have "some bruising about the face and the rupture of the left [eye]." Sharp was resuscitated, and kept alive on ventilators because "the heart was not beating on its own and ... [he] was not breathing on his own." Sharp's eye also was repaired. He did not regain consciousness after several days. After un-

successfully trying to locate his family, the hospital took him off the ventilators and pronounced him dead due to brain injury. During cross-examination, Dr. Greene denied that Sharp's injuries could have been caused by the paramedics dropping Sharp when they were treating him and transporting him to the hospital on an emergency basis.

The medical examiner, Dr. Marie–Lydie Pierre–Louis, testified as an expert in forensic pathology. She ruled that the manner of death was homicide, specifically, "blunt impact trauma to head with perforation of eye and subdural hematoma." Dr. Pierre–Louis testified that Sharp had injuries to his forehead and to his eye, which indicated that there were at least two impacts. Both injuries had been sustained within three days of her examination, but she could not tell whether the eye injury was caused by a sharp or a blunt object because the eye had been sutured. She testified that the eye is very resilient and "it takes a lot of force to perforate the eye." She also testified that she could discern three different impacts—to the eye, and to each side of the head—but that one forceful impact to the eye could have caused all the internal injuries. Dr. Pierre–Louis testified that Sharp had sustained brain injuries as shown by the "recent hemorrhage on the right side of the head as were on the left side[.]" There was also fatal damage to the spinal cord. On cross examination by defense counsel, Dr. Pierre–Louis testified that there was cocaine residue in Sharp's blood.

## II. ANALYSIS

### A. *Autopsy Photographs*

Appellant argues that the trial court abused its discretion in admitting two au-

---

4. Detective Donna Giles of the Metropolitan Police Department, who interviewed Adams immediately after the incident, testified that Adams told her that he saw appellant pull out "something shiny ... like a crow bar" out of a bag that he was carrying.

topsy photographs showing Sharp's "ruptured eye," and his "sawed-off skull and exposed brain." Before trial, the government moved *in limine* to admit three autopsy photographs of Sharp: a "close up" of his face, a photo "show[ing] very descriptively [Sharp's] left eye," and a photo of his brain "show[ing] substantial subdural hemorrhaging." The prosecutor argued that the photos were being introduced because "[t]his is a one punch case. . . . [A]nd we're going to contend tha[t] it was an excessive blow. And certainly if the defense of self defense is raised that makes it completely relevant." Defense counsel objected to the photographs of Sharp's eye and exposed brain because "they are truly very gory in nature . . . very gory and graphic photograph[s]." The trial court reserved ruling on the motion until hearing the testimony of the forensic expert.

Defense counsel renewed the objection to the photographs during the testimony of the medical examiner. With respect to the picture of the eye, counsel said, "[T]he doctor has just testified that this is a picture of him after some kind of treatment. . . . She does not know what the eye looks like. . . . This suggests that—it suggests a worse injury than what it is." As to the photograph of the exposed brain, counsel argued that it was unnecessary because the doctor had made a diagram "that shows the same thing."

The trial court admitted the photographs over counsel's objection:

First of all, [the photograph of the eye] corroborates the laceration to the forehead and the bruising on the eye lid. Secondly, I agree with the government's argument that, in fact, whether it is a repaired ruptured eye or the original ruptured eye . . . it is evidence of the severity of the injury.

And secondly, with respect to the photograph of the brain, the autopsy report itself refers to jelly or dark areas where jelly-like blood formation exist. And those are clearly depicted in the photograph. The argument that a diagram also could show this does not require that the government not use photographs which clearly and without being prejudicial show the injuries that the doctor is talking about.

So each of these photographs clearly corroborates those injuries which according to the autopsy report and according to the government's theory caused the death, the subdural hematomas and the ruptured eye.

In addition, the severity of the injury is at issue in this case and the degree of force that was used to inflict the injury, in other words, how far did he hit him. And I agree that each of these photographs is evidence that supports the government's argument that the blow was with a great force rather than a blow that didn't cause that much injury. . . .

For all these reasons I find under Rule 403 that the photographs are extremely probative and material issues that the Government is advancing. And that the photographs themselves are not so prejudicial that prejudicial impact substantially outweighs the probative value. They are not gory photographs.

[The eye photograph] shows the victim's face cleaned up. It's not a garish, death mask sort of face.

And with respect to [the brain photograph], this is a cleaned up fairly anatomical photograph of the human brain. It's a picture that nobody particularly wants to look at because a picture of anyone's skull. . . . It's clean and neat for an exposed brain.

■ We review the trial court's ruling to admit the photographs for abuse of

discretion. "In matters involving relevance, we have recognized that 'the evaluation and weighing of evidence for relevance and potential prejudice is quintessentially a discretionary function of the trial court, and we owe a great degree of deference to its decision.'" *Daniels v. United States*, 738 A.2d 240, 253 (D.C.1999).

Although trial counsel represented during the hearing *in limine* that she was not challenging "the principle that the blow, the punch, and whatever resulted from the punch, was sufficient to cause the death and that something else must have been the cause"—which would have weighed against the pictures' relevance—trial counsel did not make this argument when renewing the objection at trial. Instead, trial counsel argued that the photograph of the eye was not relevant because it showed the eye after surgery, and that the photograph of the brain was cumulative of the diagram showing the "same thing." "So," trial counsel argued, "the only purpose of these pictures is to gross somebody out."

■ "[T]he fact that the photographs were cumulative evidence ... does not render the pictures inadmissible provided that their probative value outweighs any prejudice from their value." *Pittman v. United States*, 375 A.2d 16, 19 (D.C.1977). Concerning probative value, the pictures may be admitted "so long as they were in some way relevant, either independently or as corroborative of other evidence." *Id.; see also Old Chief v. United States*, 519 U.S. 172, 186–87, 117 S.Ct. 644, 136 L.Ed.2d 574 (1997) ("[A] criminal defendant may not stipulate or admit his way out of the full evidentiary force of the case as the Government chooses to present it."); *United States v. Rezaq*, 328 U.S.App. D.C. 297, 314, 134 F.3d 1121, 1138 (1998) ("Autopsy photographs can have immense probative value, if for example they confirm

the prosecution's theory about the manner in which the crime was committed.").

■ Here, the trial court did not abuse discretion in admitting the photographs. The court did not admit the photographs at first blush, preferring to defer ruling until "I can see the photo and I can hear where it fits in." Upon considering the medical examiner's testimony and seeing the photographs as they related to the government's case, the judge evaluated their relevancy and their potential prejudicial impact. The photographs were relevant to show the severity of the injuries Sharp suffered to prove that appellant had used excessive force when he punched Sharp in the face. Indeed, the jury sent a note during deliberations, asking, "Are we missing a government exhibit of a photo of the victim with his injured left eye?" The note indicates that the jury thought the photograph was relevant to its deliberations.

■ "When relevant evidence is challenged on the ground of unfair prejudice, it may be excluded only if 'the danger of unfair prejudice *substantially* outweigh[s] [its] probative value....'" *Daniels*, 738 A.2d at 253. Here, the trial court considered the issue, and found that the prejudice did not substantially outweigh the pictures' probative value. The testimony that had already been admitted would have alerted the jury that the case involved some graphic and unpleasant evidence. Not only had the court admitted—without objection—a "close up" of Sharp's face, but the trauma surgeon and the medical examiner had also gone into great detail explaining Sharp's injuries. *See Daniels*, 738 A.2d at 253 ("We cannot deny that the graphic testimony and photographs challenged in this case [of the victim with thirteen gunshot wounds] presented some risk of prejudice. That fact, however, does not necessarily mean that the evidence

should have been excluded."). As we noted in *Daniels,* we have sustained admission of graphic photographs as relevant including, "a murder victim laying face down in a pool of blood," a "rape victim who was burned with an iron," a "murder victim at crime scene," and an "emaciated two-year-old child neglected by parents." *Id.* As opposed to a crime scene picture, "the photographs ... taken in a clinical setting somewhat reduce[ ] [their] prejudicial effect...." *Rezaq,* 328 U.S.App. D.C. at 314, 134 F.3d at 1138. Here, the trial judge opined that the photographs were "not gory." Moreover, there is no indication that the size of the photographs or the manner in which the prosecutor used them at trial was intended to, or did, inflame the jury. *Cf. Chatmon v. United States,* 801 A.2d 92, 101 (D.C.2002) (trial court noted that photographs were displayed to jury during prosecutor's rebuttal "for no apparent reason other than 'to inflame the passion of the jury'" while urging jurors to "render a verdict that they could live with"); *id.* at 114 (Farrell, J. concurring) (admonishing that a "prosecutor jeopardizes a conviction by excessive zeal in brandishing photographs of this sort" while exhorting the jury to return a guilty verdict). We, therefore, conclude that the trial judge did not abuse its discretion in deciding that the autopsy photographs' probative value as to the force used to cause the injuries, which corroborated the medical examiner's testimony concerning the manner and cause of death, was not substantially outweighed by prejudice to the defendant.

### B. *Ineffective Assistance of Counsel*

Appellant argues that the trial court abused its discretion in denying his two § 23–110 motions claiming ineffective assistance of counsel without a hearing. In these motions, appellant argued that trial counsel provided him with ineffective assistance by failing to secure the presence of an exculpatory witness for trial and by failing to call an independent forensic witness.

"Under the oft-stated two prong test established in *Strickland,* appellant must show (1) deficient performance by his trial counsel, and (2) prejudice traceable to his trial counsel's deficiencies." *Joyner v. United States,* 818 A.2d 166, 173–74 (D.C. 2003). To establish counsel's deficient performance, appellant must show that counsel's "representation fell below an objective standard of reasonableness." *Strickland v. Washington,* 466 U.S. 668, 688, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). To establish prejudice, appellant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. 2052. "Failure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim." *Id.* at 700, 104 S.Ct. 2052.

1. *Failure to secure the presence of an exculpatory witness*

Appellant claims that trial counsel failed to locate Sheila Graham, who was an eyewitness. At trial, counsel proffered that Graham was an exculpatory witness who would have testified that she did not see a weapon in appellant's hand:

[**Defense counsel**]: We believe that it's a *Brady* witness because Mr. Strozier is charged with second degree murder *while armed with a hard object. This witness says in the grand jury that there was nothing in his hand.* The only witness that the government now has will say that he does have something in his hand. We believe it is a *Brady* witness and an essential to our defense.

. . . .

**The court:** Do you agree with the proffer that [defense counsel] gives, in other words, that this is the only witness who would say that the defendant *had no weapon in his hand?*

**[Prosecutor]:** Well, I think perhaps it's a matter of . . . how you view her testimony. She sees it from a greater distance than the one witness that we do have.

I submit she would testify her eyes fall upon the two to them, the two men, at the time of the punch. She doesn't really see anything that precedes it. It mean, certainly I think the defense can make that argument that she doesn't see—she does say she doesn't see a weapon in the person's hand.

(Emphasis added).

Even if we assume that counsel should have done more to find Graham and present her as a witness, we see no prejudice resulting from her absence at trial. Graham's grand jury testimony was admitted into evidence, and Adams, also an eyewitness, flatly denied that he saw appellant use a weapon, but that he *inferred* from Sharp's injury that appellant had used a weapon. The jury ultimately acquitted appellant of the charge of assault while armed. Because Graham's presence at trial was sought to disprove the government's charge that appellant had a weapon, appellant was not prejudiced by her absence.

2. *Failure to call a forensic expert*

 Appellant also claimed that although trial counsel had listed a forensic expert, Dr. Jack Daniel, as a potential witness, he was not called to testify at trial. Appellant argues that trial counsel "simply failed to develop medical evidence that could have aided in [appellant's] defense . . . [b]y failing to impeach the government's expert or present differing medical evidence to show that the force was not as significant as asserted . . . ."

The trial court rejected this argument because appellant did not show how he was prejudiced by the trial counsel's decision not to call Dr. Daniel as a witness. *See Robinson v. United States,* 797 A.2d 698, 708 (D.C.2002) ("In the absence of any proffer of expert testimony . . . , the trial judge could properly conclude that the claim that counsel was ineffective for not calling such an expert was 'vague and conclusory' and, therefore, that [petitioner] was not entitled to a hearing."). Appellant failed to show prejudice, as the trial court noted, because he did not submit with his motion a statement, declaration, or affidavit of the potential witness setting forth in detail what his testimony would have been, as required by the D.C. Court of Appeals. *See Metts v. United States,* 877 A.2d 113, 122–23 (D.C.2005) (affirming trial court's denial of § 23–110 petition where appellant failed to make a "credible proffer from one or more these prospective witnesses"); *see Hairston v. United States,* 905 A.2d 765, 783 (D.C.2006) (holding that trial court did not err in denying petition without a hearing where appellant "presented no affidavit in support of his allegations, as we have required in other cases, and the trial court found his assertions regarding trial counsel and his ( [appellant's] ) statement to the police 'palpably false' "); *Fields v. United States,* 698 A.2d 485, 489 (D.C.1997) ("The fact that [appellant] has not provided an affidavit from any of these witnesses is itself a sufficient ground to reject without a hearing allegations of ineffectiveness premised on the failure to call them."); *Ready v. United States,* 620 A.2d 233, 235 (D.C.1993) (footnote omitted) ("The absence of an affidavit or other credible proffer . . . persuades us that the trial court did not err in declining to hold a hearing.").

Because there is no record of how Dr. Daniel would have testified, or an affidavit from counsel, we cannot assess whether trial counsel simply failed to follow-up with Dr. Daniel, or made a considered judgment not to call him. Counsel's initial listing of Dr. Daniel as a potential expert witness could be read as an indication that, after reviewing the forensic evidence and interviewing Dr. Daniel, counsel decided not to call him as a witness. "[S]trategic choices made as a result 'will seldom if ever' be found wanting." *Strickland,* 466 U.S. at 681, 104 S.Ct. 2052. "Because advocacy is an art and not a science, and because the adversary system requires deference to counsel's informed decisions, strategic choices must be respected in these circumstances if they are based on professional judgment." *Id.* Without some evidence that counsel failed in his duty to investigate, we cannot surmise that counsel was ineffective in not calling Dr. Daniel. *Cf. Cosio v. United States,* 927 A.2d 1106, 1124–27 (D.C.2007) (en banc).

■ In addition, we see no prejudice from trial counsel's decision not to call a medical expert. Appellant claimed that he punched Sharp in self-defense, but the prosecutor argued that appellant had reacted unreasonably to Sharp's drunken pestering and threats, punching Sharp in the eye with excessive force.[5] This argument was based on the medical examiner's testimony that the eye, which is usually very resilient, was ruptured by the blow inflicted. The medical examiner also testified that the punch had caused the neck to twist, severing Sharp's spinal cord from the brain stem, which was the fatal injury. In cross-examination, however, defense counsel was able to elicit from the medical examiner that Sharp's injuries were consistent with appellant's theory of self-defense: "hitting a punch square to the eye with no object and then [Sharp] hitting a tree and falling down to the ground."[6] *See Curry v. United States,* 498 A.2d 534, 543 (D.C.1985) (trial counsel's deficiency in failing to obtain available medical records and secure an independent medical expert was not prejudicial when the government's medical evidence also supported defense theory of the case); *Tillery v. United States,* 419 A.2d 970, 974 (D.C.1980) (no prejudice unless trial counsel's incompetence "blot[s] out" a substantial defense). Defense counsel was also able to explore alternative causes with the medical examiner, including the possibility that Sharp's death may have been caused by the paramedics dropping him during transit or as an untoward result of the accumu-

---

**5.** As the prosecutor argued in rebuttal:

> Was there ever any evidence that Billy Sharp raised his hands? Did anything? Did anything other than to be a pain in the ass. No evidence of that at all.
>
> The defense in this case wants you to determine that he only had one option. That John Strozier's only option was a fatal blow to the head. That's it. A fatal blow to the head or nothing. Well, how about if he did owe him the money, pay him the money. How about keep walking? He had already walked 2 blocks. How about call the police? Hey man, this guy is bugging me.
>
> How about shove had him out of the way? How about push him out of the way?

> Let's not stop there. How about kick him? How about stomp on this foot? How about grab him on the shoulders and say, man get the hell out of here? How about punch him in the shoulder, punch him in the stomach, punch him in the back.

**6.** The prosecutor agreed with this chain of events, telling the jury in closing:

> Remember what Dr. Pierre–Louis said? His neck instantly turned. So that blow went to his left eye causing his head to turn, causing his forehead to describe (sic) against the tree. He hit his head on the pavement and then he was there, out, never, ever to regain consciousness. It was over.

lated injuries that Sharp had sustained during his time as a boxer.

 Although D.C.Code § 23–110(c) creates a statutory presumption in favor of holding a hearing when there is an allegation of ineffective assistance of counsel, the right to a hearing is not automatic. *See Hairston,* 905 A.2d at 783. "[N]o hearing is required where defendant's motion 'consists of (1) vague and conclusory allegations, (2) palpably incredible claims, or (3) allegations that would merit no relief even if true,' " *Joyner,* 818 A.2d at 174 (quoting *Courtney v. United States,* 708 A.2d 1008, 1011 (D.C.1998)), or (4) if the issues are "capable of resolution on the existing record," *Fields v. United States,* 698 A.2d 485, 489 (D.C.1997). The court "review[s] the trial judge's denial, without a hearing, ... for abuse of discretion." *Alston v. United States,* 838 A.2d 320, 324 (D.C.2003).

Here, the trial court explained that it would not hold a hearing on the first motion claiming ineffective assistance of counsel because "[t]he defendant's claims are all vague or conclusory." Appellant did not submit any affidavits or any other evidence with his motion that required an evidentiary hearing. As discussed above, the trial court did not abuse its discretion in denying appellant's initial claim of ineffective assistance on the merits based on the existing record. *See Metts,* 877 A.2d at 123 (no hearing required if statements of witnesses are vague and not exculpatory); *cf. Steward v. United States,* 927 A.2d 1081, 1088–89 (D.C.2007) (hearing required when trial counsel failed to investigate an accomplice's sworn statement, which—if credited—would have been ex-

culpatory); *Jones v. United States,* 918 A.2d 389, 409 (D.C.2007) (hearing required when trial counsel failed to call alibi witnesses and no record indicating that it was a tactical decision or that counsel even knew of witnesses' existence); *Lanton v. United States,* 779 A.2d 895, 899, 904 (D.C. 2001) (hearing required when counsel did not interview exculpatory witnesses and judge discredited their letters, submitted "as a kind of informal affidavit").

3. *Denial of the second § 23–110 motion without a hearing*

 Appellant filed a second § 23–110 petition, making the same claims as in his first motion claiming ineffectiveness of counsel. This time, however, appellant attached an affidavit of Dr. John E. Adams, a forensic pathologist identified by appellate counsel.[7] The trial court denied the motion without a hearing, on procedural grounds. *See* D.C.Code § 23–110(e) ("The court shall not be required to entertain a second or successive motion for similar relief on behalf of the same prisoner."). The court, however, also analyzed the petition on its merits, and denied it, citing two independent reasons. First, because appellant did not contend that trial counsel knew of Dr. Adams or his opinion during trial, counsel could not be deemed deficient for not calling a witness whom she did not know. Second, the trial court found, even if Dr. Adams had testified at trial as proffered in the affidavit, it is unlikely that his testimony would have altered the trial's outcome.

We disagree with the trial court's assessment that the second petition could be

7. Appellant's counsel stated in their opening brief to this court that "the undersigned's Firm has retained, at its own expense, an independent expert to review the matter, and he requires further information from the District of Columbia Medical Examiner's office that will be sought by subpoena before an affidavit can be filed." Appellants then filed a second § 23–110 motion during the pendency of the direct appeal and the appeal of the first § 23–110 motion. See note 1, *supra.*

denied on procedural grounds because it supplemented the first and was filed during the pendency of the direct appeal. *See McCrimmon v. United States*, 853 A.2d 154, 160–61 (D.C.2004). However, we agree with the trial court that appellant still fell short in showing that his trial counsel's performance was constitutionally ineffective. As the trial judge noted, trial counsel cannot be blamed for not calling Dr. Adams, whose existence was unknown to counsel at the time. Appellant does not dispute this; moreover, appellant does not allege that Dr. Daniel, the forensic expert trial counsel had anticipated calling at trial, held the same opinions as Dr. Adams and would have so testified. Appellate counsel states in his brief that "the undersigned will seek to provide either an affidavit or Dr. Daniel's live testimony if a hearing is ordered," but this begs the question, why appellant chose to submit an affidavit from an expert other than the expert appellant claims his counsel had listed as a witness and should have called as an expert witness at trial. As discussed in connection with appellant's first § 23–110 motion, that claim fails because we do not know how Dr. Daniels would have testified. "Without such a proffer, the trial court did not abuse its discretion in denying appellant's motion alleging ineffective assistance of counsel...." *See Forte v. United States*, 856 A.2d 567, 577 (D.C.2004).

■ Even if we assume that what appellant means to say is that *any* expert would have testified as Dr. Adams opined, or that counsel should have identified and called Dr. Adams at trial, we perceive no prejudice to appellant from the absence of such testimony. In his affidavit, Dr. Adams states that, contrary to the medical examiner's testimony, "the source of the

trauma [to the eye] more likely [was] the surgery than a major blow by a fist." He also disagreed with respect to the damage to the spinal cord, which rather than caused by appellant's punch, "probably was the result of 63 hours on a respirator, severe brain swelling and interference with blood supply to the brain and cord." [8] Dr. Adams was of the view that Sharp might have had a previous head injury that could have been exacerbated by a "minor trauma." Dr. Adams criticized the medical examiner's autopsy, noting that "important historical evidence of prior repetitive head trauma from boxing was either unknown or ignored." This historical evidence should have been assessed, he said, "because a prior subdural bleed predisposes to recurrent bleeding form relatively minor trauma." Appellant argues that Dr. Adams's opinion directly "challenged the cause and manner of death and would have provided the jury with an alternative theory regarding Mr. Sharp's death."

■ Even had the jury considered Dr. Adams's opinion, we do not think there is a reasonable probability that it would have swayed the verdict finding appellant guilty of unarmed manslaughter. Dr. Adams's opinion does not negate any of the elements of involuntary manslaughter, the crime of which appellant stands convicted. "Involuntary manslaughter ... is described as a killing without an intent to kill or do bodily injury." *Morris v. United States*, 648 A.2d 958, 963 (D.C.1994). "[T]he two elements of involuntary manslaughter were derived from the common-law principle that unintentional acts resulting in death were not excused and were thus manslaughter where the killings occurred 'in the course of lawful acts carried out in an unlawful, i.e., criminally negligent

---

**8.** Dr. Adams dismissed, without elaboration, Dr. Pierre–Louis's explanation that the punch to the eye caused torsion of the neck to such a degree as to sever the spinal cord, saying that her explanation was "unique to me."

fashion' or 'in the course of unlawful, i.e., criminal acts.' " *Donaldson v. United States,* 856 A.2d 1068, 1076–77 n. 14 (D.C. 2004) (quoting *Comber v. United States,* 584 A.2d 26, 48 (D.C.1990) (en banc)). Distilling these principles, the essential elements of involuntary manslaughter are "(1) an unlawful killing of a human being (2) with either (a) the intent to commit a misdemeanor dangerous in itself or (b) an unreasonable failure to perceive the risk of harm to others." *United States v. Bradford,* 344 A.2d 208, 216 (D.C.1975). The jury was properly instructed, without objection, as follows:

> The essential elements of involuntary manslaughter, each of which the government must prove beyond a reasonable doubt, are as follows.

> One. That the defendant caused the death of the decedent. Two. That he did so while committing or attempting to commit the offense of assault. And three. That he committed or attempted to commit the assault in a manner that created a reasonably foreseeable risk of appreciable physical injury.

> A foreseeable risk of appreciable physical injury exists when physical injury is a possible consequence of the manner in which the crime is committed or attempted.

> The government need not prove that the defendant specifically intended to kill or injure the decedent. The government also need not prove that the defendant was armed with a weapon.

▪ Here, it is undisputed that appellant punched the victim in the face, whereby he sustained injuries, was hospitalized, and died. The jury, which was instructed on the permissible use of deadly and non-deadly force, rejected appellant's claim of self-defense. This was enough to convict of involuntary manslaughter absent some exceptional intervening cause. Appellant committed a crime by assaulting the victim, and the victim died as a result of naturally succeeding events. Eyewitness Richard Adams testified that appellant's punch caused a "gash" so severe that he thought appellant had used a weapon. Sharp, who was obviously drunk,[9] fell down against a tree and hit the ground, unconscious. When the ambulance arrived, Sharp was in cardiac arrest; upon arriving at the hospital, before undergoing surgery on his eye, he remained in cardiac respiratory arrest, *i.e.,* he was not moving, not breathing, and his heart was not beating on its own. He was kept alive by ventilators for three days. Dr. Adams's affidavit offers an alternative explanation for the extent of Sharp's injuries: that the rupture of the eye was "more likely [caused by] the surgery than a major blow by the fist," and that the spinal cord damage "probably was the result of 63 hours on a respirator," brain swelling and reduced blood flow. Significantly, Dr. Adams did not opine that appellant's punch to Sharp's face did not require either the surgery to repair the eye or the respirator treatment necessitated by his fall and unconscious state. As we have said, medical treatment—including negligent medical treatment—that contributes to or immediately leads to death is not an intervening cause that relieves a defendant from criminal responsibility for the death, because even negligent medical treatment is a foreseeable consequence of injury.[10] *McKinnon v. United States,* 550 A.2d 915,

---

**9.** The toxicology report showed the presence of cocaine in Sharp's blood.

**10.** There is an exception to the theory of proximate causation in criminal cases if the fatal injury is caused by grossly negligent medical treatment. *See McKinnon,* 550 A.2d at 917. Dr. Adams did not opine that the hospital's grossly negligent medical treatment caused Sharp's death.

918 (D.C.1988) (upholding first-degree murder conviction where "a jury reasonably could have found that appellant's criminal assault necessitated surgery and related treatment that, even without [the doctor's] negligence, could have caused non-A, non-B viral hepatitis that resulted in [the victim's] death."). We do not see how Dr. Adams's disagreement with the medical examiner's testimony regarding the precise immediate cause of the fatal injuries Sharp ultimately sustained would alter the jury's finding that appellant assaulted Sharp and that he died as a result, making him guilty of involuntary manslaughter.

For the foregoing reasons, the judgment of conviction is

*Affirmed.*